Joe DINN, Jr.

v.

The STATE of Texas, Appellee.

No. 54939.

Court of Criminal Appeals of Texas, Panel No. 2.

Sept. 20, 1978.

Donald B. Dailey, Jr., Corpus Christi, for appellant.

William B. Mobley, Jr., Dist. Atty., J. Grant Jones, Asst. Dist. Atty., Corpus Christi, for the State.

Before ONION, P. J., and PHILLIPS and TOM G. DAVIS, JJ.

## OPINION

ONION, Presiding Judge.

This is an appeal from a conviction for aggravated assault, wherein the jury, having found that the appellant had been previously convicted of a felony as alleged in the indictment, assessed punishment at sixteen (16) years' confinement in the Department of Corrections.

In three grounds of error appellant complains that the trial court erred in not having him examined by a psychiatrist on the issue of his competency to stand trial, by not holding an adequate hearing to determine such issue, and in ruling the evidence was insufficient to support such issue.

We are not here confronted with a pretrial motion to appoint a psychiatrist or the refusal to impanel a jury for a pre-trial determination of competency to stand trial. The matters here complained of arose during the trial on the merits.

In order to better understand appellant's contentions, a brief summary of the facts is necessary. On July 21, 1975 the appellant about 5:30 p.m. went to the home of Jesus Davila, apparently his uncle. Davila was there with his wife, Josefa, his two children and his wife's sister, Connie Rios. The appellant changed shirts, and when he started to leave he wanted Connie to go with him, but she refused. He then forced her toward the door and then stabbed her in the hip. She ran into the kitchen and out the back door. Josefa Davila fled the house. It was later shown she went to her mother's house. The complaining witness, Jesus Davila, then asked the appellant to put the knife down, and the appellant stabbed Davila in the arms and in the abdomen and ran out the front door. Bleeding, Davila took his two children to his mother-in-law's house. The appellant appeared there, but the mother-in-law, Rufina Garcia, persuaded the appellant to give her the knife. He then fell on the floor saying, "Kill me, kill me. I just stabbed my Uncle Chooy." He stayed about three minutes and left. The appellant was later arrested and taken to jail. Davila was taken to the Memorial Medical Center, where he stayed three days.

The defensive issue at the trial on the merits was insanity at the time of the commission. There was testimony bearing on that issue, as well as testimony that the appellant had been drinking beer for some time before the alleged offense and was drunk when later arrested.

Jesus Davila, the complaining witness, describing the appellant at the time of the offense, testified that the appellant "came at me like he was berserk . . . ;" his "eyes looked like . . . he was not in his right mind." He described appellant's conduct was "weird or hard to believe" and that the appellant acted like an "insane man."

Davila's wife, Josefa, testified appellant had acted like a "crazy person" and "needed treatment." She testified appellant called her from the jail and told her that her husband had better not testify.

Rufina Garcia, Josefa's mother, testified that when the appellant came to her house after the stabbings he acted like a "crazy man . . . out of his mind." She based this on the fact he threw himself to the floor asking for someone to kill him. She related that he was a very kind, very good person to her, but when she saw him in jail he "looks very sad, like he's sick or something."

Luis Garcia, son of Rufina Garcia, testified he saw the appellant at his mother's house after the stabbings and that he (appellant) did not act like a man with good sense. He related, "I think he lost his mind." He added, "When Joe stabbed by brother-in-law, he lost his mind, you know."

Connie Rios, the appellant's girlfriend, when asked if the appellant acted crazy, replied, "I don't know." She related she, the appellant and her brother, Luis Garcia, had all been drinking beer at the Davila house, that the appellant left and upon his return the stabbings took place.

After the State rested its case, the defense called Esperanza Davila, grandmother of the appellant, who thought he was insane, not right in his mind and was getting worse. She wanted him examined by a doctor. She related that there had been no prior difficulties between the appellant and Jesus Davila and explained that appellant was drunk on the date of the alleged offense. The record also reflects on direct examination:

"Q Do you think that Joe has control over himself?

"A Well, yes, but when he drinks, that's all, he goes out of kilter then."

Sylvia Aroya, mother of the appellant, testified the appellant was twenty-one years old and had not lived with her for a year and a half. She stated she had reason to believe he was not right in his mind and was getting worse. Although it was not established when the letters were written, she related she had received letters from the appellant threatening suicide, and she believed anyone who would do that had severe mental problems. She thought her son needed psychiatric treatment. At the close of the evidence at the guilt stage of the trial, appellant conferred with his counsel and agreed that the jury need not be sequestered.

The issue of insanity at the time of the commission of the alleged offense was submitted to and rejected by the jury at the guilt stage of the trial.

At the penalty stage of the trial, appellant conferred with counsel about his plea to the enhanced portion of the indictment and about whether to testify. He did testify and his testimony was lucid.

At three different times during the presentation of the State's case in chief the court, in the absence of the jury, sua sponte, made inquiry into appellant's competency to stand trial. The first inquiry came after the testimony of Jesus Davila. The second inquiry came after the testimony of Josefa Davila, Rufina Garcia and Luis Garcia. The third and last inquiry came after the testimony of Connie Rios and the arresting officer, W. W. Whatley, Jr.

These inquiries revealed that appellant's court-appointed attorney had recently represented the appellant in a burglary case in Kleberg County and that the issue of competency to stand trial had not been raised in that case, that no pre-trial motions had been filed in the instant case, that counsel hadn't thought about having appellant examined by a physician or a psychiatrist "until today." He related he had talked and communicated with the appellant during the earlier trial and had visited with him in

the county jail prior to the instant trial. He related he had received numerous letters from the appellant, but the suggestions contained therein were nothing other than "jailhouse law" and of no practical value. Counsel expressed the opinion that appellant's judgment was poor. He based this on the fact that appellant had rejected a five year term as a part of a plea bargain agreement. When asked if appellant's ideas made sense, counsel merely referred to the facts of the instant case, his personal knowledge of the complaining witness, and the lack of provocation concerning the instant offense.

Luis Garcia testified in the inquiry that he saw the appellant in the jail and he was "not normal." Later, however, he stated the appellant was in full command of himself. When asked if the appellant was crazy, he answered, "No, not quite. He was talking fine. He was talking just right." Connie Rios testified she also saw the appellant in jail, that he answered questions, told her things and was able to communicate with her, that he made sense.

Arresting Officer Whatley testified during the inquiry that at the time of arrest the appellant came at him, that he pulled his gun and told appellant to freeze, which he did. Appellant was then handcuffed and arrested for aggravated assault, drunk and disorderly conduct. He related that appellant was upset, cursed, and made threats, and on the way to jail kept yelling obscenities to people on the street. He expressed the opinion that appellant was intoxicated at the time. He thought appellant was mean as opposed to crazy.

Tom Grace, captain in charge of the county jail, testified he had known the appellant for eight years, that appellant had been in jail under his supervision for several months prior to trial, that he observed him and communicated with him daily. He expressed the opinion that appellant could think straight, knew what he was doing, and was normal. Grace did not think appellant was crazy or out of contact. In his opinion appellant could communicate with his lawyer and answer questions. He stated that appellant was "very mean, very cold." He related that only recently an inmate was stabbed in the same cell where appellant was and that on another occasion a fire had been started in appellant's cell. He didn't know whether appellant had anything to do with the fire, but believed appellant had done the stabbing.

At the conclusion of the third inquiry and before any testimony was offered by the defense, the court dictated the following into the record:

"The Court has inquired out of the presence of the jury into the competence of the Defendant to stand trial, and based upon what the Court has heard from several witnesses, based further upon the Court's personal observations of the Defendant in Court, conferring with his counsel, his general demeanor, the Court is of the opinion and does so find that the Defendant is mentally competent and capable of standing trial."

For the first time after such ruling in mid-trial appellant's counsel asked for the appointment of a psychiatrist. The motion was denied.

Article 46.02, § 1, V.A.C.C.P., in effect at the time of appellant's trial on June 7, 1976, read:

"Section 1. (a) A person is incompetent to stand trial if he does not have:

"(1) sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding; or

"(2) a rational as well as factual understanding of the proceedings against him.

"(b) a defendant is presumed competent to stand trial and shall be found competent to stand trial unless proved incompetent by a preponderance of the evidence."

See Acts 1975, 64th Leg., p. 1095, ch. 415, § 1, eff. June 19, 1975.[1] This was a codification of the test of competency approved

1. The current version of Article 46.02, § 1, supra, contains the same language. (Acts 1977, 65th Leg., p. 1458, ch. 596, § 1, eff. Sept. 1, 1977).

by the United States Supreme Court in *Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960).

§ 2(b) of Article 46.02, supra, in effect at the time of appellant's trial, provided:

"(b) If during the trial evidence of the defendant's incompetency is brought to the attention of the court from any source, the court must conduct a hearing out of the presence of the jury to determine whether or not there is evidence to support a finding of incompetency to stand trial."[2]

§ 4(a) of Article 46.02, supra, in effect at the time of appellant's trial, provided:

"Sec. 4(a) If the court determines that there is evidence to support a finding of incompetency to stand trial, a jury shall be impaneled to determine the defendant's competency to stand trial. This determination shall be made by a jury that has not been selected to determine the guilt or innocence of the defendant."[3]

We are not here confronted with a situation where the trial judge failed to halt the proceedings on his own motion or the question of the sufficiency of the evidence to cause the judge to halt the proceedings to make inquiry. See Article 46.02, § 2(b), supra; *Johnson v. State,* 564 S.W.2d 707 (Tex.Cr.App.1977).[4] Here the trial judge stopped the proceedings three times to make inquiry, but concluded that a separate competency proceeding before a separate jury was not necessary.

We conclude that his decision was correct when the test of § 1(a) and § 2 is applied. While the questions were not as carefully phrased as they might have been, the record shows the sufficient present ability of the appellant to consult with his lawyer with a reasonable degree of rational understanding, and a rational and factual understanding of the charges against him.

Captain Grace, who had known the appellant for eight years, and had had him under daily observation for several months in jail, testified the appellant was normal, could think straight, and knew what he was doing, and could communicate with his lawyer. The testimony of Connie Rios and Luis Garcia showed that appellant was able to communicate with them, made sense, and was in full command of himself. His attorney had represented him in another felony case a short time before and did not raise any issue as to competency. He had communicated with him about the instant case and had not filed any pre-trial motions relating to a question of competency to stand trial. He thought appellant's judgment was poor because he rejected a plea bargain, etc., but he hadn't thought about a psychiatric examination until after the court conducted its' first inquiry. At no time did counsel contend that the appellant had no rational understanding of the charge against him or lacked the ability to consult with counsel with a reasonable degree of rational understanding. There, of course, is a presumption of competency under the statutes.

2. The current law contains the same language.

3. Further provisions have been added to said § 4(a), supra, by Acts 1977, 65th Leg., p. 1458, ch. 596, § 1, eff. Sept. 1, 1977. These provisions are not, however, applicable to the instant case.

4. Prior to the amendment of Article 46.02, § 2(b), in effect at the time of appellant's trial, this court consistently held that before a court will be required to halt proceedings on its own motion it is necessary that evidence come before it, from some source, of sufficient force to create in the judge's mind reasonable grounds to doubt a defendant's competency. *Bonner v. State,* 520 S.W.2d 901 (Tex.Cr.App.1975); *Ballard v. State,* 514 S.W.2d 267 (Tex.Cr.App. 1974); *King v. State,* 511 S.W.2d 32 (Tex.Cr. App.1974); *Quintanilla v. State,* 508 S.W.2d 647 (Tex.Cr.App.1974); *Perryman v. State,* 507 S.W.2d 541 (Tex.Cr.App.1974). These holdings followed that of *Pate v. Robinson,* 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966), and on occasion this court has stated the evidence must raise a "bona fide doubt" as to a defendant's competency to stand trial. *Townsend v. State,* 427 S.W.2d 55 (Tex.Cr.App.1968); *Wilborn v. State,* 491 S.W.2d 432 (Tex.Cr.App. 1973).

By the 1975 amendment to Article 46.02, the Legislature intended to preserve the bona fide doubt in the mind of the trial judge as the standard of proof to be met before a separate mid-trial determination of the accused's competency will be required. *Johnson v. State,* supra.

■ The court did not err in finding that appellant's incompetency to stand trial was not supported by sufficient evidence, did not err in refusing to impanel a jury to pass on such question, and in refusing to appoint a psychiatrist when the request was made for the first time in mid-trial under the circumstances here presented.

Next, appellant complains the trial court erred in overruling his objection to a misstatement made by the prosecutor in argument at the guilt stage of the trial.

The prosecutor argued that appellant's trial counsel had misled the jury when he argued "there couldn't be a psychiatrist for Joe Dinn, Jr.," as all he had to do was request the court to appoint one. The objection was, "We object to that, Your Honor. It's discretionary with the court." The objection was overruled.

Earlier appellant's counsel argued, "And by the way, Mr. Kamin (prosecutor) asked why didn't we get a psychiatrist or bring a psychiatrist down here to testify. Ladies and Gentlemen, that should answer itself. Those people don't work for nothing. Here's a man that's been in jail for more than a year. He can't afford a lawyer . . He doesn't have the money to hire a lawyer to represent him and yet Mr. Kamin says why didn't I go get a psychiatrist. And I'd say that would cost at least $250.00 and that's not available."

The prosecutor's objection as to the argument being misleading as to the law and facts was sustained. The record reflects that the prosecutor had never asked why the defense had not obtained a psychiatrist. The defense counsel put those words in the prosecutor's mouth, and in trying to answer the question he raised himself he attempted to show the lack of a psychiatrist was due to lack of money and thus invoke sympathy.

■ In response the prosecutor reminded the jury of the availability of the appointment of a psychiatrist for an indigent defendant. Appellant points to Article 46.03, § 3(a), V.A.C.C.P., and contends such appointment is not mandatory, but discretionary with the court. However, the prosecu-

tor's argument was invited by the misleading statement of the defense. While the appellant is correct as to the provisions of Article 46.03, supra, we cannot conclude that the prosecutor's statement was so erroneous as to be harmful under the circumstances here presented.

The contention is overruled.

■ Appellant further urges that the trial court erred in overruling his objection to the attacks upon his trial counsel by the prosecutor. The appellant calls our attention to six places in the record where the prosecutor objected to defense counsel's questions as being side-bar remarks, or as being asked in bad faith or alluding to counsel's argument as being unethical. The ground of error is multifarious and presents nothing for review. Article 40.09, § 9, V.A. C.C.P. Nevertheless, we have examined the instances presented and find no objection at the time of trial on the basis now presented on appeal. The contention is without merit.

Lastly, appellant urges the evidence is insufficient to support the enhancement portion of the indictment used to enhance punishment. The appellant argues that although the State offered the pen packet pertaining to the alleged prior conviction it did not call a fingerprint expert or other witness to identify appellant as the one named in the instruments in the pen packet and that when he was on the witness stand and referred to a prior conviction he was not asked any questions so as to identify that conviction as the one alleged in the indictment. This evidence he contends was insufficient to establish the prior conviction as alleged.

■ It is observed, however, that the appellant entered a plea of "true" to the enhancement paragraph of the indictment at the penalty stage of the trial. In *Graham v. State,* 546 S.W.2d 605 (Tex.Cr.App.1977), it was held that a defendant who enters a plea of "true" to enhancement paragraphs of an indictment cannot be heard to complain the evidence is insufficient to support the same.

Appellant has overlooked his plea of "true" and the holding in *Graham*. The contention is overruled.

The judgment is affirmed.