**Jermarr Carlos ARNOLD, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 71168.**

Court of Criminal Appeals of Texas.

Nov. 10, 1993.

Rehearing Denied Feb. 2, 1994.

Carl E. Lewis and Constance Luedicke, Corpus Christi, for appellant.

Grant Jones, Dist. Atty., Corpus Christi, and Robert Huttash, State's Atty., Austin, for the State.

## OPINION

WHITE, Judge.

Appellant was convicted of capital murder, namely murder during the commission of, or while attempting to commit, robbery. See TEX.PENAL CODE ANN. § 19.03(a)(2). Following the presentation of punishment evidence, the jury returned affirmative answers to the four special issues submitted to it. See TEX.CODE CRIM.PROC.ANN., art. 37.071(b)(1)(2) and (3).[1] The trial court sentenced appellant to death. TEX.CODE CRIM.PROC.ANN. art. 37.071. Appeal to

---

1. Now, see TEX.CODE CRIM.PROC.ANN. art. 37.071(2)(b) and (e) (effective Sept. 1, 1991). The trial court also submitted a fourth special issue in its charge to the jury at punishment:
 "SPECIAL ISSUE NO. 4.:
 After having answered 'yes' to special issue number 1 and 'yes' to special issue number 2 and 'yes' to special issue number 3, and after fully and carefully considering all of the evidence admitted at both stages of the trial, and balancing aggravating and mitigating circumstances, evidence relevant to the defendant's background, character, and circumstances surrounding the offense, it is the jury's reasoned moral response to the evidence that the death penalty is an appropriate punishment in this case."
 The jury answered "yes" to all four special issues.

this Court is automatic. Art. 37.071. We will affirm the judgment and sentence of the trial court.

In six points of error appellant argues: there was insufficient evidence to prove he was sane at the time of the commission of the offense, the trial court erred when it failed to suppress his confessions; the trial court erred when it failed to hold a competency hearing; the instructions at the punishment stage misled the jury concerning the effect of a "no" vote by a single juror; the Texas death penalty statute violates the "Eighth and Fourteenth Amendment prohibitions against mandatory sentences for any class of capital murders"; and the Texas death penalty statute fails to give the jury an option to impose a sentence of "life without parole." Because appellant raises the sufficiency of the evidence, a review of the facts is necessary.

On July 15, 1983, the Greenberg Jewelry store, located in Corpus Christi, was robbed by a lone gunman. The store's clerk, Christine Sanchez, was killed in the robbery by one gun shot to the top of the head. The victim was found wounded and unconscious by two customers, Harold McGuffy and his daughter, Tammy Lewis. McGuffy and Lewis alerted the local police just after 11:00 a.m. The victim's cause of death was confirmed by testimony of the medical examiner.

Investigation of this robbery/murder had focused on a possible suspect, namely one Troy Alexander. The investigation had further caused the discovery of an eyewitness. Joe Morano testified that he had observed and had a short conversation with a large black male in the Greenberg Jewelry store after 10:30 a.m., but before 11:00 a.m., on July 15, 1983. Morano testified to noticing that the black male was a "big man, about six feet or six feet one ... with big round shoulders." Morano had also noticed the man's eyes "... always like a cat—real small." Morano further testified to the presence of the victim, whom he had known casually.

The investigation into this robbery-murder was stalled for five years or more, because of the lack of further information. Then a letter suddenly appeared, in which the author claimed knowledge of the crime. The local District Attorney received the letter from appellant, who at the time was a California prison inmate. Appellant's letter claimed to have information about the Greenberg Jewelry store robbery/murder in 1983 and about Troy Alexander. Later investigation revealed that appellant had written several letters to the news media, namely to the Caller–Times and one of its reporters, Libby Averyt. Investigation into the contents of appellant's letters to the District Attorney and the news media resulted in appellant's various confessions to this crime.

Appellant, in his second point of error, brings forward a challenge to the sufficiency of the evidence to support the jury's rejection of his affirmative defense that he was insane at the time of the commission of the offense. Appellant does not otherwise challenge the sufficiency of the evidence. Appellant argues, "the evidence was insufficient to show beyond a reasonable doubt that the appellant was sane at the time of the commission of the offense and the verdict of conviction and the sentence of death violate the defendant's rights on Art. I, Sec. 10 of the Texas Constitution and under the Sixth, Eighth and Fourteenth Amendments of the United States Constitution." [2]

Appellant filed his Motion for Court Appointed Psychiatrist on October 1, 1990, well in advance of trial. The trial court appointed a psychiatrist to examine the appellant and instructed the named psychiatrist to submit his written report concerning the sanity and

---

2. Appellant claims that his conviction and sentence of death constitute violations of the cited sections of both the Texas and United States Constitutions. However, appellant provides no discussion, argument or analysis showing how such lack of evidence is in violation of any principle or doctrine under either constitution. Appellant's brief fails to show how the actions of the trial court violated either constitution. Further, appellant's brief fails to show either the similarities or the differences in the protection afforded by the two constitutions, and violates this Court's clear directive in *Heitman v. State*, 815 S.W.2d 681 (Tex.Cr.App.1991). In *Heitman*, we reiterated the briefing requirements and stated that the court could reject the ground [or point of error] as multifarious. In spite of the incomplete and multifarious nature of appellant's constitutional claims, we will address the merits of such claim here.

competency of the appellant pursuant to the pertinent statutes. On November 14, 1990, also in advance of trial, appellant filed his Notice of Intention to Raise Defense of Insanity.

The State responds to appellant's argument concerning sufficiency of the evidence to prove sanity by saying that the jury's rejection of appellant's affirmative defense was supported by the evidence at trial. The record reveals appellant was found not guilty by reason of insanity in Colorado in 1978. In 1982, in California, appellant was declared to be insane. The 1982 declaration was not shown to have been vacated. The State admits, because of appellant's prior unvacated adjudication of insanity, that it had the burden of proof in establishing the sanity of appellant at the time of the offense, citing *Manning v. State,* 730 S.W.2d 744 (Tex.Cr. App.1987). See also *Riley v. State,* 830 S.W.2d 584, 585 (Tex.Cr.App.1992).

Under *Manning,* this Court held that if there was a prior adjudication for incompetency or a prior adjudication of insanity, the burden of proof shifts to the State to prove beyond a reasonable doubt that a defendant was competent to stand trial or sane at the time of the commission of the offense. *Manning,* 730 S.W.2d, at 748–750. In *Riley,* this Court relied upon *Manning* to hold where there has been a prior adjudication of insanity that has not been vacated, the burden falls upon the State to prove beyond a reasonable doubt that the subject was sane at the time of the commission of the offense. *Riley,* 830 S.W.2d, at 585.

The trial court's instructions to the jury properly placed that burden upon the State. The charge submitted by the trial court instructed the jury that the appellant, "... having been adjudged to be insane prior to the offense ... is presumed to have been insane at the time of ... the alleged offense." The charge further instructed the jury as to the State's burden of proof to show sanity "at the time of the alleged commission of the offense by evidence beyond a reasonable doubt." The charge also instructed the jury that if they "... do not find beyond a reasonable doubt, or if you have a reasonable doubt, that the defendant was sane at the time he committed the act, if he did, then you cannot convict him, and in such case you are bound to find him not guilty by reason of insanity." The jury found appellant guilty as charged in the indictment.

■ Having found the trial court's instructions accurately set out the law on the shift of the burden to the State to prove appellant's sanity beyond a reasonable doubt, we must review the evidence at trial to determine if the State met that burden. In reviewing that evidence, we must look at that evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found appellant to be sane beyond a reasonable doubt. *See, Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Butler v. State,* 769 S.W.2d 234, at 238 (Tex.Cr.App. 1989); and *Blankenship v. State,* 780 S.W.2d 198, at 207 (Tex.Cr.App.1989) ("we are not to sit as a thirteenth juror reweighing the evidence or deciding whether we believe the evidence established the element in contention beyond a reasonable doubt."). We will review the evidence is the instant case in light of these standards of review.

■ The jury here had conflicting testimony from medical experts and lay witnesses concerning appellant's sanity at the time of the offense. Appellant's principal psychiatric witness, Dr. Morall, in response to questions from appellant's attorney, indicated that appellant's mental condition in May 1983, when he escaped from the Colorado State Hospital, was severe enough that appellant would not have known that his criminal conduct was wrong. However, when asked her opinion on cross-examination about the appellant's ability to conform his conduct to the requirements of the law in July 1983, the time and date of this offense, which was also approximately two months after his escape from the hospital, Dr. Morall's opinion as to appellant's "legal" sanity was less certain. She said:

"Well I think, you know, he remained mentally ill. I'm sure there were times when his behavior was appropriate, but I would think that the most—the driving force, or the most dominant factor at that

time would have been the fact that his illness would have been fairly full-blown and with no control."

Dr. Sheppard testified for the State in rebuttal of Dr. Morall. Dr. Sheppard acknowledged appellant's many diagnoses by other medical professionals of psychosis and schizophrenia, paranoid type. Dr. Sheppard further testified that he did not find any evidence of paranoid schizophrenia in his daily observations and several examinations of appellant. Sheppard said that when he examined appellant in 1987 he found no evidence of paranoid schizophrenia. Sheppard admitted his awareness that other medical professionals had diagnosed appellant as demonstrating varying degrees of paranoia and schizophrenia.

However, Sheppard testified that:

"A person who is schizophrenic doesn't necessarily mean that they are going to be criminal, and they certainly can appreciate right from wrong. Even in very acutely psychotic states, they can tell right from wrong, I think answers your question."

Sheppard testified that his conclusions were based on his in-depth psychological testing of appellant over a number of days as well as one on one conversations with appellant over a protracted period, rather than just on a historical review of appellant's condition, with possibly a several hour interview. Sheppard found appellant to be bright and intelligent, "at least average or better." Sheppard testified that someone in an acute phase of schizophrenia would be obviously mentally ill, even to the lay person. Sheppard testified that in very severe cases, "and I would say rare cases", that schizophrenia could bring a person to a point where he or she didn't know the difference between right and wrong, or to the point where he or she could not conform their conduct to the law. Sheppard then testified that a hypothetical person described as intelligent, trustworthy, and regularly employed would indicate a person of clear and coherent thinking. Sheppard admitted being aware that appellant had been found insane in Colorado in 1978. Sheppard also admitted being aware of Dr. Morall's reports on appellant in 1982.

Dr. Kutnick, who examined appellant on order of the court in October 1990, testified concerning his opinions and conclusions. Kutnick first explained the methods and observations involved in a mental status examination for the jury. Kutnick had previously reviewed appellant's psychological history. Kutnick testified that appellant came across as "normal, cordial, rational, alert, not hallucinating." Kutnick testified that appellant told Kutnick of "a number of [mental] evaluations and that he [appellant] had fooled a number of people in the mental health field." Kutnick found "no acute mental syndrome." Kutnick admitted that the "patient could hide the symptoms, but that his diagnosis of appellant had been 'Axis II', or 'antisocial personality disorder.' " Kutnick acknowledged the disagreement among the various professionals concerning appellant's mental condition. Kutnick said that appellant, in discussing this offense, its planning and execution, as well as the motive, namely "the need for money to buy drugs, alcohol and pay for prostitutes," came across as honest and sincere while saying "spontaneously that he killed the lady in cold blood," and that appellant used the words "premeditated" and "calculated" in characterizing his motive. Kutnick finally testified that "he could not detect any evidence of schizophrenia or paranoid ideation. I was looking for those kinds of things. I just couldn't detect any. He came across as perfectly rational, perfectly intact, mentally clear."

Dr. Meenakshi, one of the two psychiatrists offered by appellant, testified to his observations of appellant and his review of appellant's medical history. Dr. Meenakshi confirmed the disagreement among the professionals as to the sanity of appellant. In fact, Dr. Meenakshi's testimony itself contains statements reflecting various diagnoses, including that of sanity and insanity. Dr. Meenakshi's testimony, at one point, reflects agreement with the diagnosis of Dr. Kutnick, to the effect that appellant was sane in 1990 when seen by Kutnick.

Meenakshi agreed, based on his personal contact and on his reviewing of appellant's medical reports, that appellant had periods of time when he was free of any psychosis.

Meenakshi admitted that predicting when appellant might be free of the psychosis and when he might be suffering from it would be impossible.

Meenakshi further testified that he had reviewed reports of other medical evaluations in which appellant was found to be faking his mental illness. Meenakshi admitted that some of appellant's concern for his own safety might be a reflection of a realistic assessment of conditions in any prison rather than a reflection of paranoia. Meenakshi admitted that even in a state of paranoid schizophrenia, a patient might be able to know the difference between right and wrong, and might be able to conform his conduct to the law. Meenakshi testified that, based on appellant's varying medical reports, there was no way to tell whether appellant was suffering from such a psychotic episode on July 15, 1983, or that he was unable to conform his conduct to the law, unless the medical evaluator was there either right before or right after the offense, "or at least immediately after he was caught."

Meenakshi admitted that, for purposes of determining "legal" insanity, the appellant's actions and conduct in planning the offense, and the circumstances of the offense itself, as well as the appellant's appearance to other persons as normal, all might be indications of appellant's mental condition at the time of the commission of the offense.

Carolyn Sowers had rented a room to appellant just a few days prior to the subject offense. Sowers had known appellant as Troy Alexander previously and had several conversations with him prior to this offense in July, 1983. Sowers was not a medical doctor but had some training in psychology.[3] Sowers described appellant as intelligent, trustworthy and regularly employed. She rented a room to appellant as Troy Alexander. Sowers had several conversations with appellant during July 1983, just a few days prior to the instant offense.

The jury had all this evidence from several sources, including that appellant had planned the robbery and had watched the jewelry store until what appellant thought was an opportune moment for the robbery. The jury had testimony concerning appellant's theft of an automobile and use of such automobile in completing and making a successful escape from the robbery. The jury had evidence of the circumstances surrounding the offense, especially from appellant's various confessions. The jury had evidence of appellant's admission in his confession of burying the weapon used to shoot the victim. The weapon was never recovered. The jury had evidence from at least one of the experts that appellant had previously been declared insane because of appellant's purposeful mimicry of symptoms displayed by appellant when evidently appellant's actions were caused by being under the influence of mind-altering drugs. A rational trier of fact could have concluded that the confessions and the other evidence were indications that appellant, in his attempted deceptions, knew that his conduct was wrong and was sane at the time of this offense.

Here we are presented with various types of evidence bearing, to a greater or lesser degree, on the determination of sufficiency to show sanity. There was testimony here from the various expert witnesses, recited above, concerning their examinations and observations of appellant's mental condition. There was also testimony from Carolyn Sowers and from appellant's various confessions, and evidence of the crime itself which all reflected on appellant's mental condition at the time of the commission of the instant offense.

After reviewing all of the evidence bearing on this point of error, we hold that there was sufficient evidence admitted at trial for any rational trier of fact to conclude beyond a reasonable doubt that appellant was sane at the time of the commission of the instant

---

**3.** Dr. Sheppard confirmed the principle that someone in an acute phase of schizophrenia would be obviously mentally ill to even the lay person. Dr. Sheppard said that the lay person might not know the correct diagnosis or "label," but would certainly be able to recognize the actions and conduct of such mentally ill person as strange. In other words, observations of the actions and conduct of such mentally ill person, even by one not trained in the field, would be pertinent to making a determination of such mental illness. That principle has been approved by this Court. *Thomas v. State,* 701 S.W.2d 653 (Tex.Cr.App.1985).

offense. *Manning v. State,* supra; *Riley v. State,* supra; *Jackson v. Virginia,* supra; *Butler v. State,* supra; and *Blankenship,* supra. Appellant's second point of error is overruled.

In his first point of error, appellant argues "the trial court erred in failing to suppress the confessions offered by the State against the appellant in violation of the appellant's right under Art. I, Sec. 10 of the Texas Constitution and the Fifth and Fourteenth Amendments of the United States Constitution." Appellant claims that such confessions were not shown to be voluntary and were unduly influenced and improperly induced by the State's payment of money and by the promise of such payment. Appellant claims that his mental condition, at the time of such confessions, is "extremely relevant" to the issue of voluntariness of the confessions.

■ Appellant fails to analyze, argue or provide authority to establish that his protection under the Texas Constitution exceeds or differs from that provided to him by the Federal Constitution. We will therefore not address appellant's state constitutional argument. See *Heitman v. State,* 815 S.W.2d 681 (Tex.Cr.App.1991).[4]

Investigation of the instant offense was stalled for years. For years authorities had only a witness' statement that a large black male was present in the vicinity of the jewelry store a few minutes prior to the commission of the offense, and the name of a suspect, "Troy Alexander." They had no description of "Alexander", and no knowledge of his whereabouts.

In response to letters addressed to the local District Attorney, wherein the writer claimed knowledge of the offense and the suspect, "Troy Alexander", Corpus Christi police officer Paul Rivera and Texas Ranger Robert Garza went to California to talk with the letter writer. Appellant was identified by name as the writer.

Upon arrival by the officers, appellant claimed knowledge of the robbery and murder at the Greenberg Jewelry Store in 1983. Appellant stated he knew something about the case that the officers were investigating. Appellant said that "he knew there is a reward. There is reward money to be offered." Appellant said "I want 500.00 dollars of that reward money before I can ever start telling you-all anything." Garza responded that he was not aware of any reward money being offered and that the Department of Public Safety does not have provisions for giving reward money. Garza reminded appellant that appellant's letter had not mentioned reward money and that they were not prepared to come up with any reward money at that time. Appellant claimed to know who the "perpetrator" was, but wanted the $500.00 up front. Appellant finally decided to tell the officers part of his story if they assured him that he would get $500.00 in two installments, specifically $250.00 immediately and $250.00 later.

Garza and Rivera discussed this situation and called Corpus Christi Police Commander Sullivan, who agreed to send the initial $250.00. Garza and Rivera returned to see the appellant and advised him that arrangements had been made to get the first $250.00 wired to them through Western Union. Appellant began to tell the officers about the offense. At that point, the officers were unaware of appellant's involvement.

Appellant responded to the officer's questions and gave the impression that he was intelligent and understood the questions. Garza testified that appellant did not appear to be intoxicated by either narcotics or alcohol. Appellant was advised several times of his *Miranda* rights in detail by Garza and seemed to understand those rights and warnings. Appellant acknowledged ·that he understood the *Miranda* warnings and asked no questions concerning them. Appellant's speech was coherent and understandable.

---

4. In *Heitman,* supra, this Court explained that briefs claiming constitutional violations under the state and federal constitutions should provide argument, analysis and authority supporting and explaining each separate claim of constitutional violation. The briefs should show how constitutional protection differ under the state constitu-

tion as opposed to the protection provided by similar provisions in the federal constitution. Appellant's brief fails to provide such argument, analysis or authority. *DeBlanc v. State,* 799 S.W.2d 701 (Tex.Cr.App.1990); *McCambridge v. State,* 712 S.W.2d 499, 501–502 (Tex.Cr.App. 1986).

Appellant did not invoke his right to have an attorney present or his right to remain silent. Garza testified that appellant was not coerced or threatened in any way. Garza testified to these facts, explaining that he and Rivera were in California at the appellant's request. Garza stated that appellant wanted to meet with the officers to tell them what he knew of the instant offense. Garza said that appellant's statements, before and after the *Miranda* warnings, were voluntarily and freely given.

Appellant made two confessions after receiving warnings. Both statements were recorded, put into typewritten form and signed by the appellant before a notary public and two other witnesses. The statements, written and recorded, were introduced into evidence after the trial court ruled they were admissible. The trial court made certain at the hearing on the Motion to Suppress that appellant understood his right to testify only on the Motion to Suppress hearing without being subject to cross-examination concerning the offense. Appellant did not testify. Only the State's witnesses testified as to the circumstances surrounding the confessions.

In connection with its ruling, the trial court made specific findings of fact and conclusions of law. Those findings and conclusions reflected a decision that the confessions were voluntary and were not coerced because of improper promises or coercion. The trial court found appellant initiated both the request to talk with the officers and the request for the reward money when the officers were unaware of the existence of reward money. The trial court specifically found that appellant's request for reward money was a condition of appellant's talking with the officers. The trial court also specifically found that at the time of appellant's request for reward money, he was not a suspect. The trial court found that appellant's request for reward money was not the result of any actions by the officers who took his statements. The trial court found that appellant was not improperly induced or coerced to make the statements by the receipt of money or the promise of such money. The issue of the voluntariness of the confessions was also submitted to the jury in the court's charge.

The jury implicitly found the confessions voluntary.

 We have held on several recent occasions that the trial court is the sole fact-finder at a hearing on a Motion to Suppress. We will not disturb such ruling where supported by the record. *Johnson v. State*, 803 S.W.2d 272, 287 (Tex.Cr.App.1990), and cases cited therein; *Green v. State*, 615 S.W.2d 700, 707 (Tex.Cr.App.1980), cert. denied, 454 U.S. 952, 102 S.Ct. 490, 70 L.Ed.2d 258 (1981). The ruling by the trial court, as well as his findings of fact and conclusions of law, are supported by the record.

 The officers' agreement to pay appellant his requested reward did not render his confessions involuntary. In order for a confession to be rendered involuntary by the promise of a benefit, the test set out in *Fisher v. State* must be met. In *Sossamon v. State*, 816 S.W.2d 340, 345 (Tex.Cr.App. 1991), this Court relied upon the test:

> The promise must be: (1) of some benefit to the defendant, (2) positive, (3) made or sanctioned by a person in authority, and (4) of such character as would be likely to influence the defendant to speak untruthfully. [citing *Fisher v. State*, 379 S.W.2d 900, 902 (Tex.Cr.App.1964); *Washington v. State*, 582 S.W.2d 122, 124 (Tex.Cr.App. 1979) ].

*Sossamon*, supra. *Sossamon* involved an agreement for immunity from prosecution. In *Jacobs v. State*, 787 S.W.2d 397, 399 (Tex.Cr.App.1990), we applied the *Fisher* test in determining whether the promises of a District Attorney may have caused a confession to be involuntary because of improper inducement.

In *Jacobs,* the defendant had offered to tell the officers what they wanted to know in exchange for certain assurances, namely (1) that the District Attorney would seek the death penalty, and (2) that the defendant be allowed a one hour visit alone with his girlfriend. This Court explained:

> "Before applying the *Fisher* test to each of the purported inducements we note that [the defendant] approached the State for assurances that certain conditions be met before he would make inculpatory state-

ments or lead investigators to the deceased's body. Because [defendant] acted in the role of dealmaker our analysis is cast in a different light. Caselaw in this area has generally reflected fact situations where the State stood accused of soliciting confessions in exchange for promises of leniency or special deals. [citing *Smith v. State,* 779 S.W.2d 417, 427 (Tex.Cr.App. 1989), and others including *Fisher,* supra.]" *Jacobs v. State,* supra, at 399.

This Court found the defendant in *Jacobs* satisfied the first three parts of the test in *Fisher v. State.* This Court ultimately rejected the defendant's argument that the promise of a visit with his girlfriend rendered his confession involuntary. In *Jacobs,* the defendant cast himself in the role of entrepreneur and as such had diminished ability to complain on appeal that he was influenced or induced to do anything. This Court in *Jacobs* found that the State did not initiate the meeting that led to the offer by appellant; the State did not proffer any inducements that supplanted the defendant as the instigator in that arrangement. The defendant in *Jacobs* was held not to have met the final prong of the *Fisher* test.

Appellant fails to satisfy that same prong of the *Fisher* test. Appellant was the instigator of the agreement concerning the reward money. Appellant requested the meetings which resulted in his confessions. Appellant initiated the discussions of reward money. We find appellant's confessions were not involuntary as a result of improper coercion or inducement. *Sossamon v. State,* 816 S.W.2d, at 345; *Jacobs v. State,* 787 S.W.2d, at 399; and *Fisher v. State,* 379 S.W.2d, at 902. Appellant's first point of error is overruled.

■ In his third point of error appellant argued the trial court "erred by not holding a competency hearing in light of the Defendant's previous adjudications of insanity, and Defendant's actions during the trial." Appellant errs in his reliance on his "previous adjudication of insanity" to support his claim to a competency hearing. Insanity and incompetency have been recognized as being controlled by separate statutes, and as similar but distinct issues of mental status with different definitions and different legal ramifications. *Manning,* 730 S.W.2d at 747. *Manning* also confirmed the principle, recognized by the case law through the years, that a defendant has the burden of proving, by a preponderance of the evidence, his incompetency to stand trial or his insanity at the time of the offense, citing TEX.PENAL CODE ANN. § 8.01 and TEX.CODE CRIM.PROC. ANN. Art. 46.02, § 1(b), *Manning,* 730 S.W.2d at 748. We stated in *Manning* that a prior adjudication of incompetency shifts the burden of proof to the State to establish competency beyond a reasonable doubt. *Manning,* 730 S.W.2d, at 748–750. However, in the instant case there was no prior adjudication of incompetency. A prior adjudication of insanity is not sufficient to raise the issue, citing *Ex parte Yarborough,* 607 S.W.2d 565 (Tex.Cr.App.1980). Appellant can only point to his actions during trial to support his argument that he was entitled to a competency hearing.

Appellant argues correctly under *Ainsworth v. State,* 493 S.W.2d 517 (Tex.Cr.App. 1973), and *Sisco v. State,* 599 S.W.2d 607 (Tex.Cr.App.1980), and *Hill v. State,* 788 S.W.2d 858 (Tex.App.—Dallas, 1990), that "any evidence, more than a scintilla," may raise the issue of incompetency so as to require a separate hearing.

The State concedes the principle, under *Sisco,* supra, *Williams v. State,* 663 S.W.2d 832 (Tex.Cr.App.1984), and TEX.CODE CRIM.PROC.ANN. Art. 46.02, §§ 2(b) and 4(a), that only a "scintilla" is sufficient to raise the incompetency issue. However, the State argues that appellant did not raise the issue of his incompetency under the test for competency to stand trial. TEX.CODE CRIM.PROC.ANN. art. 46.02.

Appellant claims in support of his showing of his incompetency to stand trial two decisions he made concerning the trial proceedings. Appellant claims the trial court erred by allowing appellant to overrule his own attorneys by: (1) not allowing them to exercise a peremptory challenge to venireperson Gonzalez; and (2) not allowing them to cross-examine several witnesses for the State. Appellant's brief fails to provide any argument

or analysis showing how his decisions to control his own trial reflected on his incompetency. Appellant claims on appeal that his actions prove his incompetency. Appellant argues his actions at trial make it apparent that he would not be able to assist his attorneys in presenting his defense. Appellant argues that his interference with his trial counsel in these decisions raised the issue of his incompetency to stand trial, thereby requiring the trial court to hold a separate hearing on competency. Appellant cites no authority for his argument. We have found no pertinent authority supporting appellant's argument.

However, the situation presented here is similar to that in *Dinn v. State*, 570 S.W.2d 910, 914 (Tex.Cr.App.1978), where the trial judge stopped the proceedings three times to make inquiry, but concluded that a separate competency proceeding before a separate jury was not necessary. *Dinn*, supra, at 914. The trial court in the instant case also stopped the proceedings several times to inquire of the various attorneys their opinion concerning the appellant's competency.

During pre-trial, in response to the questions of the trial court, specifically asking whether there was any issue raised that the appellant was incompetent, both of appellant's attorneys announced that they did not believe appellant was incompetent. The trial court stated that "he did not see any issue being raised that he [appellant] ... appears to understand from his correspondence with the court in making various requests, he seems to know exactly what is going on in court [and] is able to assist his lawyers." Then, at the end of the pre-trial discussion, after the trial court's ruling on venue, the trial court again asked the appellant's attorneys if they thought there was any issue raised concerning the appellant's competency to stand trial. The trial court noted the report of Dr. Kutnick, the psychiatrist appointed by the court, and Kutnick's conclusion that appellant was competent to stand trial. Appellant's lead trial attorney then stated that "he [attorney] did not believe he could represent to the court that I feel he's [appellant's] incompetent."

In deciding whether to cross-examine Dr. Sheppard, appellant's attorneys advised the trial court of a disagreement between them and appellant concerning the cross-examination of Dr. Sheppard and other witnesses. After the trial court explained to appellant his absolute right to control the decision about cross-examination, appellant decided not to cross-examine Dr. Sheppard and other state's witnesses. We find that appellant's exercise of control, in opposition to his attorney's decisions, while perhaps less than tactically prudent, could as easily support a conclusion that appellant was competent as he was incompetent.

As noted earlier, the trial court appointed Dr. Kutnick to examine and report on appellant's competency to stand trial. Kutnick's report found appellant competent to stand trial. All of the testifying professional medical witnesses, including Drs. Morall and Meenakshi, indicated that appellant was competent to stand trial. The trial court inquired throughout the trial as to the attorneys' opinion of appellant's competence to stand trial. After the decision to exercise a peremptory strike was overruled and after the decision to cross-examine the State's witnesses was overruled, both of appellant's attorneys indicated they thought appellant was competent. The trial court commented throughout the trial that he thought appellant was competent.

Appellant's confession and statement of his guilt to the jury, while somewhat unusual, was clear and direct. Appellant flatly denied he was insane at the time of the offense. Appellant told the jury that his offense was cold and calculated for the sole purpose to obtain money, as he had admitted to the news media. Appellant's statement reflected his rational understanding of the trial proceeding, confirming his competency to stand trial.

A trial court is only required to hold a separate competency hearing where there has been evidence that could rationally lead to a conclusion of incompetency. *Barber v. State*, 737 S.W.2d 824, 828 (Tex.Cr.App.1987), in accordance with *Pate v. Robinson*, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966). The decision in *Barber* acknowledged, under

*Sisco,* supra, and *Williams,* supra, that "in determining whether the evidence raised the issue for submission, it must be viewed in the light most favorable to the party with the burden of securing the finding, *disregarding contrary evidence and inferences* (emphasis in original)." In *Barber* this Court abated the appeal and remanded the cause for a competency hearing.

The question to be resolved then by this record is "was there any evidence throughout this trial that raised the issue of appellant's incompetency?" If the evidence presented to the trial court, "from any source" raised such issue, then the separate jury determination was required. Article 46.02, § 2(b), V.A.C.C.P.; *Sisco,* supra; *Barber,* supra.

In *Hackbarth v. State,* 617 S.W.2d 944 (Tex.Cr.App.1981), this Court held that a trial court is only required to sua sponte hold a competency hearing when sufficient facts or circumstances are brought to the court's attention that constitute evidence to support a finding of incompetency.

This Court has held that the test for competency to stand trial is whether the accused has sufficient present ability to consult with his lawyer(s) with a reasonable degree of rationality as well as factual understanding of the proceedings against him. *Leyva v. State,* 552 S.W.2d 158 (Tex.Cr.App.1977). In addition, we said in *Leyva* that a judicial determination that a person is mentally ill does not constitute a determination of a person's mental incompetency. These principles have been recently approved and followed in the San Antonio Court of Appeals. *Koehler v. State,* 830 S.W.2d 665 (Tex.App.—San Antonio, 1992).

■ Under the facts in the instant case, and pursuant to the above authorities, this Court holds the trial court was not required to sua sponte hold a competency hearing. Appellant made no such request until his brief was filed herein, even though the careful trial court, at several points during the trial, brought up the subject and provided the opportunity. Appellant's attorney here refused to say that he had reservations about appellant's competency. See also, *Russell v. State,* 685 S.W.2d 413 (Tex.App.—San Antonio, 1985). We cannot say that failure to hold the separate competency hearing, under these circumstances, was error. Such failure was not in violation of either statutory provision. In view of the test for incompetency, long recognized by this Court, there was simply no evidence on which to base a reasonable conclusion that appellant was incompetent to stand trial. *Bonner v. State,* 520 S.W.2d 901, at 905 (Tex.Cr.App.1975); *Leyva,* supra; *Ainsworth,* supra. Appellant's third point of error is overruled.

■ In his fourth point of error appellant argues "the instruction given at the penalty phase misled the jury regarding the effect of a "no" vote by a single juror in violation of the Fifth, Eighth and Fourteenth Amendments and Texas law."[5] Appellant argues that such prohibition and failure to instruct about the effect of a "no" vote is misleading to the jury and that such state-mandated deception makes the jury more likely to vote in the affirmative on the punishment issues. Appellant further argues that such impermissible instruction denies appellant a "reliable and fair sentencing procedure under those amendments to the Constitution."

The State responds to this argument by saying that the jury instruction given was proper under the statute and was constitutional under *Cantu v. State,* 842 S.W.2d 667 (Tex.Cr.App.1992). This same issue has been addressed by this Court in several opinions in addition to *Cantu.* In each of these cases the issue was resolved contrary to appellant's argument. We held in *Sterling v. State,* 830 S.W.2d 114 (Tex.Cr.App.1992):

> "[t]he jury in a capital murder case is responsible for answering questions the result of which will determine the life or death of an individual. Any information that is given the jury which may be interpreted by it as relieving that responsibility

---

5. As in point of error one, appellant here fails to analyze, argue or provide authority to establish that his protection under the Texas Constitution exceeds or differs from that provided to him by the Federal Constitution. We will therefore not address his state constitutional argument. *Heitman v. State,* 815 S.W.2d 681. See note 3, infra.

is considered an infraction upon their fact-finding function."

*Sterling,* supra, at 122.

In *Draughon v. State,* 831 S.W.2d 331 (Tex.Cr.App.1992), we reaffirmed the principle that there is no apparent constitutional inhibition to concealing from jurors the consequence of their deliberations, so long as they are not misled into believing that ultimate responsibility for the verdict rests elsewhere. *Draughon* specifically held that such prohibition did *not* so mislead them. That conclusion applies here and requires a similar conclusion unless such were overturned. See also, *Nobles v. State,* 843 S.W.2d 503 (Tex.Cr.App.1992); and *Muniz v. State,* 851 S.W.2d 238 (Tex.Cr.App.1993).

The trial court here was required to instruct the jury as he did. The statute and instruction, as reflected by the cited authorities, was constitutionally adequate. *Draughon; Nobles;* and *Muniz.* Appellant's fourth point of error is overruled.

██ In his fifth point of error appellant argues the "Texas Death Penalty Statute, as construed by the Texas Court of Criminal Appeals, violates the Eighth and Fourteenth Amendments prohibitions against mandatory sentences for any class of capital murderers." Appellant relies upon *Sumner v. Shuman,* 483 U.S. 66, 107 S.Ct. 2716, 97 L.Ed.2d 56 (1987), and *Hernandez v. State,* 757 S.W.2d 744, 751 (Tex.Cr.App.1988). Appellant claims by our decision in *Hernandez* that "the law has predetermined what the punishment will be depending only on certain conditions." In *Hernandez* this Court stated:

"Unlike criminal juries generally, a capital jury is never called upon to assess punishment. In fact, nobody assesses punishment in a capital case. The law has predetermined what the punishment will be depending only upon certain conditions. The jury, as factfinder, only determines whether those conditions exist. The judge then pronounces sentence as the law requires. Neither is vested with any discretion in this regard. Indeed, the discretion was purposefully taken from judge and jury alike by the legislature of this State in order to meet the perceived constitutional requirements of *Furman v. Georgia,* 408

U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). [footnote not included]."

*Hernandez,* supra, at 751, overruled on other grounds, *Fuller v. State,* 829 S.W.2d 191 at 200 (Tex.Cr.App.1992), cert. denied, —— U.S. ——, 112 S.Ct. 2944, 119 L.Ed.2d 568 (1992).

Appellant asserts in view of the above language in *Hernandez,* the Texas statute is unconstitutionally mandatory in nature and similar to the statute addressed in *Sumner.* Appellant's brief fails to clearly explain and analyze this assertion, and is subject to challenge on that basis. We do not interpret the above statement from *Hernandez* to conclude that the statute is mandatory in nature. We have addressed this point directly in *Boggess v. State,* 855 S.W.2d 656, at 664 (Tex.Cr.App. 1989).

In *Boggess* we upheld the constitutionality of the Texas statute and clearly stated that the statute is *not mandatory,* but rather the jury is required to make an individualized determination and consider any relevant mitigating evidence. As in *Boggess,* appellant was evidently permitted to present all of the desired mitigating evidence at the punishment phase. Appellant does not complain that he was prevented in the instant case from introducing any relevant mitigating evidence by virtue of this statute.

We note that *Sumner* involved a conviction and sentence from Nevada. The Nevada statute did mandate the death sentence for one found guilty of murder while serving a separate sentence for life without parole. *Sumner* did not resemble the instant situation or the situation presented in *Boggess.* Our statute simply does not contain any such mandate.

The reversal in *Sumner* was premised on reasoning that individualized determinations of mitigating factors was mandated in capital sentencing proceedings. *Sumner* provides:

"Beginning with *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), a plurality of the court recognized that in order to give meaning to the individualized sentencing requirement in capital cases, the sentencing authority must be permitted to consider 'as a mitigating fac-

tor, any aspect of defendant's character or record and any of the circumstances of the offense.' [citations omitted]."

*Sumner*, supra, 483 U.S. at 75, 107 S.Ct. at 2722.

In *Sumner* the Court went on to confirm the constitutionality of statutes such as Art. 37.071:

"In sum, any legitimate state interests can be satisfied fully through the use of a guided discretion statute that ensures adherence to the constitutional mandate of heightened reliability in death penalty determinations through 'individualized sentencing procedures."

*Sumner*, supra, at 85, 107 S.Ct. at 2727.

Our statute has consistently been interpreted to provide such individualized sentencing procedure through guided-discretion. *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976); *Franklin v. Lynaugh*, 487 U.S. 164, 182, 108 S.Ct. 2320, 2332, 101 L.Ed.2d 155, 171 (1988); *Boggess*, supra; *Matson v. State*, 819 S.W.2d 839 (Tex. Cr.App.1991); *Trevino v. State*, 815 S.W.2d 592 (Tex.Cr.App.1991); *Black v. State*, 816 S.W.2d 350, 361 (Tex.Cr.App.1991). Appellant's fifth point of error is overruled.

In his sixth point of error appellant argues the "Texas Death Penalty Statute violates the Eighth and Fourteenth Amendments by failing to give the jury an option of imposing a sentence of life-without-parole." Appellant's premise here is that "our evolving societal standards today demand that capital sentencing authorities be permitted to consider imposing a sentence providing for life without parole as an alternative to the death penalty." Appellant argues that our statute, for the absence of such provision, is in violation of the Eighth Amendment as providing "cruel and unusual punishment." Appellant cites *Penry v. Lynaugh*, 492 U.S. 302, 330, 109 S.Ct. 2934, 2953, 106 L.Ed.2d 256, 286 (1989), and *Ford v. Wainwright*, 477 U.S. 399, 405, 106 S.Ct. 2595, 2599, 91 L.Ed.2d 335 (1986), and several state statutes from states other than Texas, in support of his constitutional argument here. Appellant also cites several law review articles and

referenced surveys, all in support of a claimed "overwhelming national consensus against execution without a provision for life without parole." Appellant does not provide any pertinent direct authority.

The State responds to this constitutional challenge by saying that the argument has been addressed and rejected by the Fifth Circuit in *Andrade v. McCotter*, 805 F.2d 1190 (5th Cir.), cert. denied 475 U.S. 1112, 106 S.Ct. 1524, 89 L.Ed.2d 921 (1986).

In *Andrade v. McCotter*, the Fifth Circuit addressed the question presented by appellant in this point of error and rejected that challenge to the constitutionality of the Texas Capital Murder Statute pursuant to *Jurek*.[6] The Fifth Circuit explained:

"The Texas capital punishment statute passed muster in *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976). The punishment to be assessed for the offense of capital murder, as for all other state criminal offenses, is a matter for the state legislature. Neither the eighth amendment nor any other provision of the Constitution mandates the enactment of a particular punishment for a particular crime. That determination is left to the exercise of judgment by each 'democratically elected legislature.' [citing *Gregg*, supra, and other authorities]. The Texas legislature has established two punishments for capital murder, death and life imprisonment. Neither sentence is constitutionally disproportionate and a constitutional sentencing scheme does not require the establishment of the third sentencing option advanced by [defendant]."

*Andrade*, supra, at 1193. Decisions of the Fifth Circuit are not binding on this Court. However, we agree with the reasoning of the Fifth Circuit in *Andrade v. McCotter*.

The Texas Capital Murder Statute is not unconstitutional for failing to provide an optional penalty of "life-without-parole." If the Legislature wishes to adopt such a statute, it is within their sovereign responsibility to do

6. *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976).

so. Appellant's sixth point of error is overruled.

The judgment of the trial court is affirmed.

CLINTON and MALONEY, JJ., dissent.