# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-04-00004-CR

**Samuel Allen Webb, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF SAN SABA COUNTY, 33RD JUDICIAL DISTRICT NO. 5231, HONORABLE GUILFORD L. JONES, III, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Samuel Allen Webb, the campus director of a residential treatment home for emotionally troubled children, appeals from a conviction by a jury of sexual assault of a child in his care. Specifically, appellant was convicted of engaging in sexual intercourse with a child on or about October 20, 1999. *See* Tex. Pen. Code Ann. § 22.011(a)(1)(A) (West Supp. 2004-05). The jury assessed his punishment at fifteen years' imprisonment. In six issues, he challenges the factual sufficiency of the evidence to support the conviction, the trial court's denial of a mistrial and motion for a new trial on the grounds that (i) a juror also served on the grand jury that returned the indictment against appellant and (ii) the State failed to disclose to appellant the possibility that the complainant was filing a civil suit against appellant, and that the trial court improperly limited his cross-examination of the complainant. We affirm the judgment of conviction.

## FACTUAL BACKGROUND

After years of sexual molestation by a stepfather and an otherwise deteriorating family situation, the complainant, P.L.T., was admitted to a juvenile center and then to the Big Spring State Hospital where she was treated for behavior that included running away, aggression, self-mutilation, and suicide attempts. She was then placed at the Cherokee Home for Children, a state-licensed residential facility for emotionally troubled children affiliated with a religious organization, located in San Saba County. P.L.T. was fifteen-years-old on May 28, 1999, when she arrived at the home. At appellant's trial, P.L.T. testified that the home was the perfect place for her and that she thrived under the care of her house parents, Gann and David Templeton. Her house parents and counselors also testified to her progress.

Appellant and his spouse, Carla Webb, began working as house parents of a cottage at the home in July 1989. After leaving for a brief time in 1993, they returned in 1994 to serve again as house parents until appellant was promoted to the position of campus director in March or April 1998. His duties included maintenance and care of the campus, the buildings, and the lawns.

The trial testimony focused on that of P.L.T., who testified that she encountered appellant when she first arrived at the home. She recalled that in September 1999 appellant and Mrs. Webb were serving as relief house parents when he first approached her in an improper manner. She testified that appellant and his wife were driving the girls home from a football game in a nearby town late one night. Mrs. Webb was driving and appellant was in the passenger seat; P.L.T. was seated behind appellant and the other girls were sleeping. In response to P.L.T.'s complaint that her neck ached, appellant reached back and started rubbing her neck. As he continued to rub her neck,

2

he slipped his hand inside P.L.T.'s t-shirt and touched her breast. She pulled back against her seat but said nothing. When they returned to the cottage, she encountered appellant in the laundry room where she had gone to retrieve some sheets for her bed. He kissed her and, she testified, touched her inappropriately over her clothing: "He would touch me on my breast and on my hip and between my legs." The encounter was brief and appellant told her he was going to come into her bedroom at night and wake her up.

P.L.T. testified that she "believe[d] it was that next day" that appellant came into her bedroom at night, after everyone had gone to bed, and tapped her on the ankle. She followed him into the living room away from the room she shared with four girls. She could not explain why she went with him: "He was being real nice to me. He would tell me that I was beautiful" and make coffee for her. Appellant began touching her as they sat in the living room and the other occupants of the cottage slept. He then took her to a van outside the cottage where they engaged in sexual intercourse. They returned to the cottage and she went to bed. The next two nights, P.L.T. recalled that appellant came into her room, tapped her on the ankle, and they left the cottage, engaging in sexual intercourse in a maroon truck parked next to the cottage that she thought belonged to appellant or his father.

P.L.T. testified to other sexual encounters with appellant, including one in a camper on the grounds of the home on the day a charitable auction was held at the home and one on or about October 20 in the gym where appellant was arranging chairs for a gathering. P.L.T. testified, as did house parent Gann Templeton, that appellant called Mrs. Templeton to send P.L.T. over to the gym to help him. P.L.T. was hesitant and did not want to go: "I was getting scared. I just—I was

3

getting—just my nerves were really bothering me then." Mrs. Templeton told her that he had called and that she "needed to go over there and help move chairs." When she arrived, appellant was upstairs alone. He told her where to hide if someone came into the gym. They then engaged in sexual intercourse on a chair and P.L.T. returned to her cottage.

Meanwhile, appellant began handing P.L.T. notes at church, or sometimes leaving them under her mattress, and instructing her to discard them. On her birthday, he left her a birthday card with $40 enclosed under the mattress of her bed. P.L.T. testified that, soon thereafter, appellant told her that Mrs. Webb had learned of appellant's encounters with her, and P.L.T. saw that Mrs. Webb was upset—as was P.L.T. P.L.T. knew something was wrong one morning when Mrs. Webb was cooking and she threw some eggs out of the pan. P.L.T. started crying and ran outside. Mrs. Webb followed her, hugged her, and apparently tried to comfort her. Later, Mrs. Webb talked to her and wanted to make sure she would not tell anyone about appellant. In her presence, appellant apologized to P.L.T. saying "in front of [Mrs. Webb] that he wasn't going to do it anymore and that he was sorry."

Testifying on his own behalf, appellant denied the allegations of the indictment and P.L.T.'s accusations. He testified that he never had physical contact of any sort with P.L.T. and denied engaging in any sexual activity with her. He attributed the allegations to P.L.T.'s mental problems, her sexual experience and background, and animosity among the employees. Appellant was convicted of a single count of sexual assault of a child.

4

**ANALYSIS**

On appeal, appellant challenges the factual sufficiency of the evidence to support his conviction, the presence of a juror who had also served on the grand jury that had indicted appellant, the failure of the State to disclose evidence, and the trial court's improper limitation on cross-examination of the complainant. We first address factual sufficiency.

*Factual Sufficiency*

Appellant argues that the evidence is factually insufficient to support his conviction because no sexual activity occurred, and the evidence contrary to the State's case is so strong that there is reasonable doubt. He and his wife both testified and disputed P.L.T.'s accusations. He urges that the prosecution's case rests on witnesses who are biased and not credible. Thus, he urges that the verdict was contrary to the overwhelming weight of the evidence because the defense evidence greatly outweighed the State's evidence to the extent that the contrary finding is clearly wrong and manifestly unjust.

In a factual sufficiency review, we view all of the evidence in a neutral light, and we will set the verdict aside only if the evidence is so weak that the verdict is clearly wrong and manifestly unjust, or the contrary evidence is so strong that the standard of proof beyond a reasonable doubt could not have been met. *See Zuniga v. State*, 144 S.W.3d 477, 484-85 (Tex. Crim. App. 2004). We review the fact finder's weighing of the evidence and may disagree with its determination. *Clewis v. State*, 922 S.W.2d 126, 133 (Tex. Crim. App. 1996). But a factual sufficiency analysis can consider credibility only on those few matters bearing on credibility that can be fully determined from a cold appellate record. *See Johnson v. State*, 23 S.W.3d 1, 8 (Tex. Crim.

5

App. 2000). A factual sufficiency review must employ appropriate deference to the fact finder's role as the sole judge of the weight and credibility to be given to witness testimony. *Id*. at 7.

The case revolves around the testimony of P.L.T.—who testified that the sexual assaults occurred over a period of time, including in October 1999, the date set forth in the indictment—and of appellant, who denied any sexual contact. P.L.T. testified extensively on direct and cross about her troubled background and the fact that she first denied that "anything had happened" to an investigator from Child Protective Services. Her admission assessment stated that she had abused drugs and was sexually promiscuous and manipulative. Appellant suggests that P.L.T. had a motive to lie because she was facing disciplinary action at school, evidently in the form of corporal punishment. Appellant also questions the relationship between P.L.T. and house parent Robin Brack, the person to whom P.L.T. made the first outcry on April 3, 2000. Brack reported the outcry to his supervisor, Terry Moore, whose credibility appellant also challenged at trial. Brack testified that he had two supervisors: Moore and appellant. Moore was his supervisor with respect to Brack's counseling duties, including child safety, child protection, therapy group sessions, and house parenting. Appellant supervised Brack's duties regarding taking care of the physical needs of the campus and children, including mowing the lawns and feeding the children. As to his relationship with appellant, Brack testified: "We didn't have a relationship. He was my supervisor and that was it." On cross-examination, Brack acknowledged that, after he had left the home, he had sent an inappropriate e-mail to one of the young women at the home. The e-mail was admitted into evidence. Brack also acknowledged that appellant had "written him up" in a disciplinary report on

6

one occasion. Brack testified that he and his wife resigned as house parents in January 2000 and left at the end of the school year.

That friction existed among the administrators at the home was evident throughout the testimony at trial. Terry Moore became employed at the home in August 1997. As a licensed child care administrator, he was qualified to serve as an administrator at a residential facility. He began as director of social services with duties that included the screening and selection of children for the home. He performed admission assessments and developed service plans for each child's treatment. Moore's wife, Linda, also worked at the home as a social worker who counseled the children.

Shortly after Moore arrived at the home, the position of executive director became available, and, although Moore applied for the position, Danny Duggan was hired. Moore was promoted to program and clinical administrator, and appellant became campus manager, initially reporting to Moore. In January 1999, due to apparent strain between appellant and Moore, Duggan altered the line of reporting so that both appellant and Moore reported directly to him. When P.L.T. made the initial outcry to Brack, he reported it to Moore because Duggan was on vacation and away from the campus. Moore then reported it to the state authorities; the relationship between Moore and Duggan became strained and Moore resigned his position at the home. Moore testified that the strain resulted "[b]ecause I had learned that Mr. Duggan had engaged in some things that were inappropriate in handling matters of the sexual abuse outcry." Appellant and Moore both ran for election for a position on the local school board, and appellant was elected. Moore acknowledged that appellant won the election but did not believe that was the source of their friction.

Appellant thus argues that the State's witnesses gave contradictory testimony, that they were not credible, and that they had motives to lie about the events in question. But there was corroborating testimony. Gann Templeton testified that appellant called over to the house for P.L.T. to come to the gym to help him set up the chairs for an event, and that P.L.T. was very reluctant to go and then was gone too long. She also testified that appellant would ask her which bed belonged to P.L.T. when he inspected the cottage. Both Mrs. Templeton and P.L.T. testified to a gift of a shawl from appellant's wife prior to P.L.T.'s outcry. The State introduced into evidence a birthday card P.L.T. had taped to her wall signed "Love—me." P.L.T. testified that she had received the card from appellant, and other known handwriting of appellant was introduced for the jury to view.

Child Protective Services investigator Steve Morgan testified concerning his interview of P.L.T. and the circumstances of the written statements given by P.L.T., the first denying that anything improper had occurred. She wrote: "There's nothing happening between me and a staff member. I don't know why anyone would say this. I feel that it is very dumb. I feel like maybe someone is trying to get me into trouble." Her second written statement was lengthy and detailed the sexual activity. Dr. Matthew Ferrera, a psychologist, testified that children who are sexually abused may go for long periods of time before they make an outcry. He described how they learn to cope, how that behavior manifests itself, and that sexually abused children are more likely to be abused again.

The motives and the credibility of the witnesses were fully ventilated throughout the trial. Because the jury is the sole judge of the credibility of witnesses and the weight to be given their testimony, we defer to its decision. When faced with starkly conflicting testimony from P.L.T.

8

and appellant, along with numerous other witnesses who testified for the State as well as the defense, the jury chose to believe the State's version of events. After viewing all of the evidence in a neutral light, we find that the evidence supporting the verdict is strong enough to support the finding of guilt beyond a reasonable doubt, and that the contrary evidence is not strong enough to prevent the reasonable-doubt standard from being met. Therefore, we conclude that a rational jury could have found appellant guilty beyond a reasonable doubt and that the evidence was factually sufficient to support the conviction. We overrule appellant's first issue.

### *Prior Grand Jury Service by Juror*

In issues two and three, appellant complains that the trial court erred by overruling his motions for a mistrial and for a new trial based upon the presence of a juror, Sara H., who had also served on the grand jury that had indicted appellant.

The granting or denying of a motion for new trial lies within the discretion of the trial court. *Lewis v. State*, 911 S.W.2d 1, 7 (Tex. Crim. App. 1995); *State v. Gonzalez*, 855 S.W.2d 692, 696 (Tex. Crim. App. 1993); *see also Ramon v. State*, 159 S.W.3d 927, 928 (Tex. Crim. App. 2005) (standard regarding motion for mistrial). An appellate court does not substitute its judgment for that of the trial court, but rather decides whether the trial court's decision was arbitrary or unreasonable. *Gonzalez*, 855 S.W.2d at 696 n.4.

The facts relating to the juror are undisputed. Appellant was indicted on November 1, 2001. Appellant's trial began on August 25, 2003. During voir dire, the prosecutor asked the jurors whether they had discussed the case with anyone, and three jurors raised their hands. Defense counsel then asked during his presentation, "Is there anybody else on the entire panel who has heard

9

anyone discuss this case or someone say they thought they knew what the facts of the case might be?" No one responded. Appellant's counsel asked no individual questions of veniremember Sara H. during his voir dire. Several veniremembers were excused for cause, the attorneys exercised their peremptory challenges, and the jury was selected. Sara H. was one of the twelve jurors who served on the jury. After the verdict but prior to sentencing, appellant discovered that she had served on the grand jury that indicted appellant.

At a hearing on September 22, 2003, on appellant's motions for mistrial and for a new trial, the court heard evidence and argument concerning the juror who had also served on the grand jury. Sara H. testified that she served on the grand jury that indicted appellant, but could not recall whether evidence had been presented or which assistant district attorney had presented the case: "[A]ll I remember was the name and the charges that were filed. I don't remember seeing any paperwork." She could not recall how many cases were presented to the grand jury and was not asked the duration or term of the grand jury's work. The following testimony then occurred in response to questions posed by defense counsel:

> Q. I take it, then, you heard some evidence for these allegations against Samuel Webb?
>
> A. Well, I heard what his charges were and where it happened. That's all I can remember.
>
> Q. When you—do you remember what was called the voir dire examination that we had here Monday, August 25th, 2003? The lawyers stood up and talked to the jury, asked the jury, prospective jurors, questions?
>
> A. Yes.

10

Q. Do you remember being asked whether or not you ever heard the facts of the case discussed in your presence or whether or not anyone had ever discussed the purported facts of the case in your presence?

A. I don't remember.

Q. You don't remember being asked that?

A. No.

Q. When you got back to deliberate your verdict in this case, did you tell anyone in the jury room that you had served on the grand jury that had returned the indictment in the case against Samuel Allen Webb?

A. No, I didn't.

The Texas Code of Criminal Procedure makes it a ground of challenge for cause that a panelist "served on the grand jury which found the indictment." Tex. Code Crim. Proc. Ann. art. 35.16(a)(7) (West 1989). It is error for a trial court to overrule a challenge for cause to a panelist who was a member of the grand jury that returned the indictment being tried. *Wolfe v. State*, 178 S.W.2d 274, 279 (Tex. Crim. App. 1944); *Mitchell v. State*, 27 S.W.2d 800, 800-01 (Tex. Crim. App. 1930). But a claim that a juror served on the indicting grand jury is a ground for challenge for cause, not an absolute disqualification. Tex. Code Crim. Proc. Ann. art. 35.16(a) (West 1989); *see, e.g., Freeman v. State*, No. 11-03-00173-CR, 2005 Tex. App. LEXIS 4030, at *4 (Tex. App.—Eastland, May 26, 2005, no pet.); *Moya v. State*, 691 S.W.2d 63, 65 (Tex. App.—San Antonio 1985, no pet.) (service on grand jury that returned indictment is ground of challenge that may be waived pursuant to article 35.16(a)); *see also Self v. State*, 47 S.W. 26, 28 (Tex. Crim. App. 1898).

The failure to question a juror about whether the juror was a member of the grand jury that returned the indictment constitutes a waiver of the right to thereafter complain that the juror was disqualified on that basis. *Mitchell*, 27 S.W.2d at 800. In *Self v. State*, the court of criminal appeals held that

> questioning of the juror . . . [generally] as to whether or not he had formed an opinion in the case, did not recall to him the fact that he had sat upon the grand jury which found the bill of indictment. . . . [I]t was not diligence on the part of appellant to rest simply upon questioning the witness as to the formation of an opinion; but he should have covered the other grounds named in the statute, if he desired to avail himself of them, before he could be held to have used due diligence as to the particular cause for challenge [the juror's prior service on the grand jury].

47 S.W. at 28. Therefore, the claim is waived unless the defendant specifically questioned the juror on potential grounds for disqualification and exercised the challenge in a timely manner. *See* Tex. Code Crim. Proc. Ann. art. 35.16(a); *see also* 43 George E. Dix & Robert O. Dawson, *Texas Practice: Criminal Practice and Procedure* § 35.65 (2001 & Supp. 2004).

Appellant failed to diligently press the statutory inquiries as to the grounds for challenge. He asked only a general question as to whether the juror had heard anyone discuss the case or say they knew anything about the facts. At no time did counsel inquire whether anyone had served on a grand jury—or the grand jury at issue—nor did he question Sara H. individually about any matter. The general question posed is insufficient to preserve a challenge for cause. *See Self*, 47 S.W. at 28. There is no question that the juror should have been excused for her prior grand jury service had she been timely challenged. But she was not queried or challenged. And appellant has not otherwise shown that Sara H. was biased or prejudiced or was not an impartial juror.

12

This case is similar to *Armstrong v. State*, 897 S.W.2d 361, 363 (Tex. Crim. App. 1995). In *Armstrong*, the issue was whether a prospective juror's failure to reveal that she and the prosecutor were close friends constituted juror misconduct in that she failed to disclose the information. *Id.* The court held that it did not because no one had asked the panelists if they knew the prosecutor. *Id.* at 364. Likewise, no one asked Sara H. or any of the jurors if they had previously served on a grand jury, or the one that indicted appellant. We overrule appellant's second and third issues.

### *Disclosure of Possibility of Civil Lawsuit*

In his fourth and fifth issues, appellant contends that the trial court erred in denying his motions for mistrial and for a new trial as a result of the State's failure to disclose that P.L.T. was filing a civil damage suit against him. He contends that the failure to disclose this information prevented him from cross-examining P.L.T. about her financial stake in the trial, denying appellant his right to counsel as guaranteed by the sixth and fourteenth amendments to the United States Constitution and article I, section 10 of the Texas Constitution.[1]

Following the verdict of guilty, appellant was served with a civil lawsuit in which P.L.T. was named as plaintiff,[2] and appellant, Duggan, and the Cherokee Home were named as defendants. At a hearing on the motions for mistrial and for new trial, the prosecutor and P.L.T.'s

---

[1] Appellant does not distinguish between state and federal constitutional claims but states that his rights under the Texas Constitution do not exceed or differ from any provided him under the United States Constitution. Therefore, relying on the language in *Arnold v. State*, 873 S.W.2d 27, 33 n.4 (Tex. Crim. App. 1993), we decline to address any state constitutional issue.

[2] The suit was filed on May 30, 2003.

civil attorney both testified.  The prosecutor testified that, shortly after the verdict was returned, she informed appellant's counsel that P.L.T.'s counsel had previously told her he wanted to file a civil suit, and that she had urged him not to file it.  The prosecutor also testified that she did not know the lawsuit had been filed and assumed that it had not been filed.  P.L.T.'s counsel testified, in response to defense counsel's question "I believe you were present during the trial of this case . . .," that he had attended the trial.  P.L.T.'s counsel also testified that the prosecutor urged him not to file a lawsuit, at least not in San Saba, because the prosecutor did not want it to interfere with the criminal trial.  He testified that he had appellant served after the trial so as not "to disrupt the proceedings" or "distract from the evidence."  The trial court overruled appellant's motions for mistrial and for a new trial.

The Sixth Amendment protects the defendant's right not only to confront the witnesses against him, but to cross-examine them as well.  *Davis v. Alaska*, 415 U.S. 308, 316 (1974).  "[T]he exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Id*.  The defendant is entitled to great latitude to show a witness's bias or motive to falsify his testimony. *Hodge v. State*, 631 S.W.2d 754, 758 (Tex. Crim. App. 1982).  In *Carroll v. State*, the court of criminal appeals stated

> Evidence to show bias or interest of a witness in a cause covers a wide range and the field of external circumstances from which probable bias or interest may be inferred is infinite.  The rule encompasses all facts and circumstances, which when tested by human experience, tend to show that a witness may shade his testimony for the purpose of helping to establish one side of the cause only.

916 S.W.2d 494, 497-98 (Tex. Crim. App. 1996). Generally, a defendant is permitted to show that the complaining witness has brought a civil suit for damages based on the same occurrence for which the defendant is being prosecuted. *Hoyos v. State*, 982 S.W.2d 419, 421 (Tex. Crim. App. 1998).

Appellant does not assert that he was precluded from inquiring into P.L.T.'s motive or bias or even the subject of a possible civil lawsuit; rather he contends that he was "prevented" from inquiring because the prosecution knew the lawsuit would "possibly be filed but did not inform the defense." He contends that the trial court abused its discretion in denying the motion for mistrial.

A prosecutor has an affirmative duty to disclose all material, exculpatory evidence to the defense. *Lagrone v. State*, 942 S.W.2d 602, 615 (Tex. Crim. App. 1997). A prosecutor violates the due process clause of the fourteenth amendment of the Constitution when he or she fails to disclose material evidence that is favorable to the accused. *Thomas v. State*, 841 S.W.2d 399, 404 (Tex. Crim. App. 1992). Favorable evidence is any evidence, including exculpatory and impeachment evidence, that, if disclosed and used effectively, creates a reasonable probability that the outcome of the proceeding would have been different. *Id*. Evidence is material if it creates a probability sufficient to undermine the confidence in the outcome of the proceeding. *Id*. Thus, a due process violation has occurred if a prosecutor (i) failed to disclose evidence, (ii) favorable to the accused, (iii) which creates a probability of a different outcome. *Id*. A reviewing court determines materiality by examining the alleged error in the context of the entire record and in the context of the overall strength of the State's case. *Id*. at 404-05. The reviewing court may consider any adverse effect that the nondisclosure might have had on the preparation or presentation of the defendant's

case in light of the totality of the circumstances and with an awareness of the difficulty of reconstructing the course of the defense and the trial in a post-trial proceeding. *Id*. at 405.

The prosecutor testified at the hearing on the motions that she did not know the lawsuit had been filed. There is no evidence otherwise. The record reflects that the prosecutor did not deliberately withhold impeachment evidence from appellant. In the absence of other evidence, then, the information about which appellant complains was never in the possession of the State. Even if we assume that this was evidence in the possession of the State that the State was required to turn over as favorable to the accused, appellant has not shown that the outcome of the proceedings would have been different had he known about P.L.T.'s desire to file a civil suit. Given P.L.T.'s conflicting written statements and her treatment history and background, it is difficult to imagine a witness with more abundant impeachment material. Thus, the evidence was cumulative and, in light of the evidence as a whole, it is not evidence sufficiently critical that would create a considerable likelihood the outcome of the trial would be different. *See Etheridge v. State*, 903 S.W.2d 1, 20 (Tex. Crim. App. 1994) (if witness acknowledges impeaching facts, nondisclosed information bearing on those facts not "material"). We overrule appellant's fourth and fifth issues.

### *Limitation on Cross-Examination*

In his sixth issue, appellant asserts that he was foreclosed from cross-examining P.L.T. "regarding her alleged lack of interest in the prosecution of the case." Because P.L.T. failed to appear at a previously set trial date, appellant urged that it was "relevant she was not interested in seeing this case prosecuted" and that she did not stay in contact with the district attorney. The trial court sustained the State's objection to the admission of that testimony. Appellant then made a bill

of exception concerning P.L.T.'s "lack of interest in the trial of these allegations in January, 2001." P.L.T. testified that she was living with her mother when she turned seventeen years old on October 15, 2000, and that her mother kicked her out of the house. She lived for a short time in Wink, Kermit, and Odessa, and then moved to Arizona in December 2001. She advised the district attorney's office of her address once she arrived in Odessa.

We review a trial court's decision to admit or exclude evidence for abuse of discretion. *Green v. State*, 934 S.W.2d 92, 101-02 (Tex. Crim. App. 1996). Where the trial court's evidentiary ruling is within the "zone of reasonable disagreement," there is no abuse of discretion and we will uphold its ruling. *Id*. This case is the opposite of *Saglimbeni v. State*, 100 S.W.3d 429 (Tex. App.—San Antonio 2002, pet. ref'd), which is cited by appellant. In that case, the San Antonio Court of Appeals reversed a conviction for indecency with a child where the trial court limited cross-examination allowing the State to give a false impression that the victim's emotional problems resulted only from acts of the appellant. *Id*. at 436. Here, P.L.T.'s mental history and family background were the subject of extensive testimony. Both written statements—one denying any sexual activity and the other describing a series of sexual overtures and acts by appellant—were introduced into evidence and were the subject of cross-examination. She was cross-examined about discipline problems at school, including about a letter of discipline she received the very day that she made the outcry to Brack. The prosecutor invited the jury to judge P.L.T.'s credibility: "And you can judge her level of manipulative behavior."

When asked by the trial court of the relevance of the evidence, counsel responded that it was relevant that she did not stay in contact with the district attorney and that she was evidently

not "interested" in the prosecution of the case. The trial court properly concluded that her "level of interest" was immaterial. The trial court did not abuse its discretion in excluding the evidence. Appellant was allowed extensive cross-examination of P.L.T., and the jury was allowed the opportunity to fully assess P.L.T.'s credibility. Appellant does not argue that the limitation left the jury with a false impression as in *Saglimbeni*. We overrule appellant's sixth issue.

Having overruled appellant's issues, we affirm the judgment of conviction.

_____

Jan P. Patterson, Justice

Before Chief Justice Law, Justices Patterson and Puryear

Affirmed

Filed:   August 4, 2005

Do Not Publish