IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






AP-75,217





HUMBERTO GARZA, Appellant



v.
 


THE STATE OF TEXAS





ON DIRECT APPEAL


FROM CAUSE NO. CR-3175-04-G IN THE 370TH DISTRICT COURT (1)

HIDALGO COUNTY




 


 COCHRAN, J., delivered the opinion of the unanimous Court.

 


O P I N I O N


 

 Appellant was indicted for two counts of capital murder. (2) In March 2005, the jury
convicted appellant of the lesser-included offense of murder in Count One and assessed a life
sentence. (3) The jury also convicted appellant of capital murder in Count Two. (4) Based on the
jury's answers to the special issues set forth in Texas Code of Criminal Procedure Article
37.071, sections 2(b) and 2(e), the trial judge sentenced appellant to death for Count Two. (5) 
The direct appeal of Count Two to this Court is automatic. (6) After reviewing appellant's
thirty-three points of error, we affirm the trial court's judgment and sentence of death in
Count Two.

 I.


STATEMENT OF FACTS


 This trial involved the gang-related, "pseudo-cop" robbery-homicide of six men, some
of whom were members of the "Texas Chicano Brotherhood," a rival gang of the "Bombitas"
or "Tri-City Bombers" gang to which appellant belonged.

 In the early morning hours of January 5, 2003, police responded to a 911 call and
found the bodies of six men at 2915 East Monte Cristo Road in Edinburg. There were two
houses on the property that were separated by a dirt driveway. Police found the body of Jerry
Hidalgo in the kitchen of the larger house that was located on the west side of the driveway
(the "west-side house"). (7) He was lying face down on the floor and his hands and legs were
bound with extension cords. He had sustained numerous gunshot wounds, and there was a
bullet hole in his back and blood around his head. The living room had been ransacked, and
it appeared that someone had rummaged through one of the bedrooms, leaving the mattress
standing on its side.

 The body of Juan Delgado, III, was lying face down in the grass outside the front door
of the smaller house on the east side of the driveway (the "east-side house"). He had suffered
a fatal gunshot wound to the back of his neck. As they entered the house, police discovered
the bodies of Juan Delgado, Jr., who had been shot in the back and head, and Jimmy
Almendarez, who had suffered multiple gunshot wounds, including a fatal head wound. The
bodies of Ray Hidalgo and Ruben Castillo were in another room. Ray had sustained two
gunshot wounds to the head and was missing an eye. Ruben had suffered multiple gunshot
wounds including shots to the buttocks. The "east-side house" had also been ransacked, and
the victims' pockets had been pulled out.

 Police received information about a "pseudo-cop" robbery and took various suspects
into custody, including appellant. Following his arrest, appellant gave a statement in which
he admitted that he was a "captain" of the Tri-City Bombers, and that he and several other
gang members put together a plan to steal what they believed was a significant amount of
marihuana from the rival gang. He described his planning of the robbery and its ultimate
execution, but denied being one of the actual killers. He stated that he and another gang
member had "dropped off" the robbers at the murder scene and then picked them up
afterwards.

II.


 In his first point of error, appellant contends that the trial court violated the federal 

and state constitutional protections against double jeopardy by subjecting him to multiple
prosecutions and multiple punishments for the same offense. (8) Appellant admits that he did
not make a double-jeopardy objection at trial. However, because of the "fundamental nature
of the double-jeopardy protections," a double-jeopardy claim may be raised for the first time
on appeal (1) when the undisputed facts show the double-jeopardy violation is clearly
apparent on the face of the record and (2) when enforcement of the usual rules of procedural
default serves no legitimate state interest. (9) 

 Count One of the indictment alleged that appellant

. . . did then and there intentionally and knowingly cause the deaths of Jimmy
Almendariz, Juan Delgado, III, Jerry Eugene Hidalgo, Juan Delgado, Jr.,
Ruben Castillo, and Ray Hidalgo, by shooting them with a firearm, and said
murders were committed during the same criminal transaction[.]


Count Two of the indictment alleged that appellant:

. . . did then and there intentionally and knowingly cause the deaths of Jimmy
Almendariz, Juan Delgado, III, Jerry Eugene Hidalgo, Juan Delgado, Jr.,
Ruben Castillo, and Ray Hidalgo, by shooting them with a firearm, and the
defendant was then and there in the course of committing or attempting to
commit the offense of robbery of Jimmy Almendariz, Juan Delgado, III, Jerry
Eugene Hidalgo, Juan Delgado, Jr., Ruben Castillo, and Ray Hidalgo, and the
defendant did then and there commit said capital murder as a member of a
criminal street gang[.]


There were two jury charges, one for each count of capital murder. The charge in Count One
defined capital murder as the murder of "more than one person during the same criminal
transaction," and it authorized the jury to convict appellant as a party. (10) The charge in Count
Two defined capital murder as murder "in the course of committing or attempting to commit
the offense of Robbery," and authorized the jury to convict appellant as a party or a
conspirator. (11) Both charges contained the same instruction on the lesser-included offense of
murder:

Now, if you believe from the evidence beyond a reasonable doubt that on or
about JANUARY 5, 2003 in Hidalgo County, Texas, ROBERT GENE
GARZA a/k/a "BONES", RODOLFO MEDRANO a/k/a/ "CREEPER",
MARCIAL BOCANEGRA a/k/a "MARSHALL", JUAN RAMIREZ a/k/a
"RAM" a/k/a "LENNY", JUAN CORDOVA a/k/a "JUANON", SALVADOR
SOLIS, a/k/a "LITTLE SAL", RICARDO MARTINEZ a/k/a "RICA" or
"RICK", JUAN MIGUEL NUNEZ a/k/a "PERRO", REYMUNDO
SAUCEDA a/k/a "KITO", JORGE ESPINOZA MARTINEZ, a/k/a
"CHOCHE", or ROBERT CANTU a/k/a "ROBBIE," hereinafter known as
CO-DEFENDANTS, did then and there did commit [sic] the felony offense of
aggravated robbery of Jimmy Almendariz, Juan Delgado, III, Jerry Eugene
Hidalgo, Juan Delgado, Jr., Ruben Castillo, or Ray Hidalgo, and that while in
the commission of said aggravated robbery, if any, or while in immediate flight
from the commission of such aggravated robbery, if any, one or more of the
said CO-DEFENDANTS, did intentionally or knowingly or recklessly shoot
any one of the following persons: Jimmy Almendariz, Juan Delgado, III, Jerry
Eugene Hidalgo, Juan Delgado, Jr., Ruben Castillo, or Ray Hidalgo, and said
act or acts were, under the circumstances then and there existing, were clearly
dangerous to human life and that said acts or acts [sic] caused the death of any
one of the following persons: Jimmy Almendariz, Juan Delgado, III, Jerry
Eugene Hidalgo, Juan Delgado, Jr., Ruben Castillo, or Ray Hidalgo, and the
Defendant, HUMBERTO GARZA, then and there knew of the intent, if any,
of one or more of the said CO-DEFENDANTS, to rob Jimmy Almendariz,
Juan Delgado, III, Jerry Eugene Hidalgo, Juan Delgado, Jr., Ruben Castillo,
and Ray Hidalgo, by shooting any one of the following persons: Jimmy
Almendariz, Juan Delgado, III, Jerry Eugene Hidalgo, Juan Delgado, Jr.,
Ruben Castillo, or Ray Hidalgo with a firearm, and the Defendant acted with
intent to promote or assist the commission of the offense of aggravated
robbery by one or more of the CO-DEFENDANTS, by encouraging, directing,
aiding or attempting to aid one or more of the CO-DEFENDANTS, to commit
the offense of aggravated robbery of Jimmy Almendariz, Juan Delgado, III,
Jerry Eugene Hidalgo, Juan Delgado, Jr., Ruben Castillo, and Ray Hidalgo, by
being leader of the gang giving the okay to commit the offense, by planning
the offense, by ordering gang members to commit the offense, by calling
Creeper to bring the weapons, by selecting certain gang members to participate
in the offense, by gathering the gang members at Juanon's house, by planning
to approach the victims' location from the empty field north of the victims'
location, by explaining the victims' location to the group, by calling Bones to
participate, by calling Ram to participate, by calling Rick to participate, by
calling Kito to participate, by calling Perro to participate, by calling Little Sal
to participate, by calling Marcial to participate, by arranging transportation to
and from the victims' location, by driving participants to the victims' location,
or by driving participants from the victims' location, then you will find the
Defendant, HUMBERTO GARZA, guilty of the offense of Murder.[ (12)] 


With regard to Count One, the jury found appellant guilty of the lesser-included offense of
murder and assessed a life sentence. With regard to Count Two, the jury found appellant
guilty of capital murder, and the trial court sentenced appellant to death. 

 The double-jeopardy clause protects against multiple prosecutions for the same
offense following acquittal or conviction. (13) It also protects against multiple punishments for
the same offense. (14) Here, the "multiple prosecutions" aspect is not implicated because
appellant was convicted and sentenced in a single proceeding. (15) Thus, we are concerned only
with the "multiple punishments" aspect in this case. (16) A multiple-punishments claim can
arise in two contexts: (1) the lesser-included-offense context, in which the same conduct is
punished twice-once for the basic conduct, and a second time for that same conduct plus
more; and (2) punishing the same criminal act twice under two distinct statutes when the
legislature intended the conduct to be punished only once. (17) 

 In this case, the application paragraphs for the lesser-included offense of murder in
Count One and Count Two were the same. Thus, the same conduct was punished twice: first
in Count One for the "basic conduct" of murder and a second time in Count Two for "that
same conduct plus more." It is clearly apparent from the face of the record that appellant was
subjected to multiple punishments for the same offense in violation of the federal and state
constitutional protections against double-jeopardy. And because both convictions arise out
of the same trial, enforcement of the usual rules of procedural default would serve no
legitimate state interest. (18) Thus, we will sustain appellant's first point of error. When a defendant is convicted of two offenses that are the "same" for double-
jeopardy purposes, the "most serious" offense is retained and the other conviction is set
aside. (19) The "most serious" offense is generally the offense of conviction for which the
greatest sentence was assessed. (20) Here, the most serious offense is appellant's capital murder
conviction in Count Two, for which he received the death sentence. Thus, we retain
appellant's capital murder conviction and death sentence in Count Two. (21)

 In point of error two, appellant argues that the trial court "erred in imposing death as
a sentence where the jury returned verdicts of both not guilty and guilty of capital-murder,
under the same factual basis." In point of error three, he complains that the charge and
verdict form failed to inform the jurors "whether a murder of more than one person in the
same transaction would include a murder in the course of a robbery." Appellant's arguments
are based on the faulty premise that his murder conviction in Count One amounted to an
acquittal of the capital-murder alleged in Count Two. 

 Appellant also asserts that "the Eighth Amendment requires that it be the death verdict
that is set aside." As we have already stated, when a defendant is convicted of two offenses
that are the "same" for double-jeopardy purposes, the "most serious" offense is retained and
the other conviction is set aside. (22) The "most serious offense" test is not an "arbitrary rule,"
as appellant argues. One reason that we apply the "most serious offense" test to double-
jeopardy violations is to eliminate arbitrariness in determining "greater" and "lesser"
offenses. (23) Because appellant's points of error two and three are without merit, we overrule
them.

 In point of error four, appellant claims that counsel "failed to preserve his right (1) not
to be twice placed in jeopardy for the same offense; (2) to have his guilt case decided by
jurors who were informed that the second count of the indictment was included in the first;
and (3) to have his acquittal of capital-murder [in Paragraph 1 of the indictment] given
preclusive effect over the later conviction [in Paragraph 2 of the indictment] for the same
offense." However, we have already agreed with appellant's double-jeopardy argument, and
he does not provide any additional argument or authorities to support an argument that his
trial counsel were ineffective under the second and third prongs of his claim. These
additional claims are inadequately briefed. (24) Point of error four is overruled.

 In point of error six, appellant asserts that he received ineffective assistance of counsel
during voir dire. He specifically focuses on the veniremembers who were selected to serve
on the jury, arguing that counsel failed to "diligently question [them] about their position,
thoughts and feelings about the death penalty for any murder, let alone multiple murder." 
He also complains that defense counsel failed to ask them if they "could consider a life
sentence as the proper punishment for the murder of more than one person in the same
transaction." He asserts that "the result of the punishment phase of the trial [was] unreliable"
because "the jury members' thoughts and feelings about the death penalty were either
unknown, or were so biased in favor of the prosecution, the result of their deliberations was
a foregone conclusion."

 To prevail on a claim of ineffective assistance of counsel, appellant must show (1)
deficient performance and (2) prejudice. (25) "Judicial scrutiny of counsel's performance must
be highly deferential." (26) To show deficient performance, the defendant must prove by a
preponderance of the evidence that his counsel's representation fell below the standard of
professional norms. (27) To demonstrate prejudice, the defendant must show a reasonable
probability that, but for counsel's unprofessional errors, the result of the proceeding would
have been different. (28) 

 A Strickland claim must be firmly founded in the record, and the record must
affirmatively demonstrate its meritorious nature. (29) Direct appeal is usually an inadequate
vehicle for raising a Strickland claim because the record is generally undeveloped. (30) This is
especially true in terms of deficient performance, where counsel's reasons for doing or
failing to do something do not appear in the record. (31) Trial counsel should ordinarily be
afforded an opportunity to explain his actions before being found ineffective. (32) Absent such
an opportunity, the reviewing court should not find deficient performance unless the
challenged conduct was so outrageous that no competent attorney would have engaged in it. (33) 

 Each prospective juror was asked in the jury questionnaire to categorize and explain
his or her feelings about the death penalty, and the State and defense counsel asked some of
them to elaborate during voir dire. The State consistently asked prospective jurors if they
could consider the full range of punishment, and defense counsel consistently asked them if
they were predisposed on punishment because there were multiple victims. The record also
reflects that defense counsel often conferred with appellant before deciding not to challenge
prospective jurors. Defense counsel could have had valid strategic reasons for conducting
the voir dire as they did. We refuse to speculate about defense counsels' possible voir dire
strategy, and we cannot conclude that their conduct was so outrageous that no competent
attorney would have engaged in it. (34) 

 Appellant has also failed to demonstrate prejudice. The result of the jury's
deliberations was not "a foregone conclusion," given that it found him guilty of the lesser-included offense of murder and assessed a life sentence in Count One. Point of error six is
overruled.

 In point of error five, appellant claims that the trial court was biased against him
because, after allowing defense counsel to conduct an inadequate voir dire, it seated a "biased
jury which was unable to consider life imprisonment as a proper punishment." However, as
discussed above, the jurors consistently answered during voir dire that they could consider
the full range of punishment and that they were not predisposed on punishment because there
were multiple victims.

 Buried within point of error five in his brief is appellant's claim that the trial court was
biased because it allowed defense counsel to proceed to trial without retaining any experts. 
He alleges that "[b]y sanctioning Defense Counsel's neglect, with regard to defense experts,
the Court helped create an unfair trial for [appellant]." (35) 

 During pre-trial proceedings on February 10, 2005, the State informed the trial court
that defense counsel had not provided "notice of experts" as requested. The following
exchange occurred:

 Court: They are requesting your list.

 Defense Counsel: I don't have experts. I'm not going to have any experts.

 Court: You are not going to be calling anybody?

 Defense Counsel: No, sir.

The trial court then asked the parties to approach the bench for an off-the-record discussion. 
We do not know the substance of that conversation, and the matter was not mentioned again. 
Absent a clear showing of bias, a trial court's actions will be presumed to have been
correct. (36) Appellant has not made a clear showing of trial-court bias. Point of error five is
overruled. 

 In point of error seven, appellant complains about the capital-murder application
paragraph in the Count Two jury charge. He alleges that (1) he was denied his right to the
presumption of innocence, (2) the State was relieved of its burden to prove its case beyond
a reasonable doubt, and (3) the language in the application paragraph "conveyed to the jury
the court's opinion on the merits of the case." 

 The jury charge in Count Two defined capital-murder as murder "in the course of
committing or attempting to commit the offense of Robbery." (37) The capital-murder
application paragraph contained two alternative theories of liability, the first authorizing the
jury to convict appellant as a party under Section 7.02(a) , and the second authorizing the jury
to convict appellant as a conspirator under Section 7.02(b). The "party" portion required the
jury to find that the co-defendants "intentionally and knowingly cause[d] the deaths" of the
victims "by shooting them with a firearm" and that one or more of the co-defendants "were
then and there in the course of committing or attempting to commit the offense of robbery"
of the victims. It authorized the jurors to convict appellant as a party if they found that

. . . the Defendant, HUMBERTO GARZA, then and there knew of the intent,
if any, of one or more of the said CO-DEFENDANTS, to rob the said JIMMY
ALMENDARIZ, JUAN DELGADO, III, JERRY EUGENE HIDALGO,
JUAN DELGADO, JR., RUBEN CASTILLO, and RAY HIDALGO, and the
Defendant acted with intent to promote or assist the commission of the offense
by one or more of the said CO-DEFENDANTS by encouraging, directing,
aiding, or attempting to aid one or more of the said CO-DEFENDANTS, to
commit the offense of Murder of the said JIMMY ALMENDARIZ, JUAN
DELGADO, III, JERRY EUGENE HIDALGO, JUAN DELGADO, JR.,
RUBEN CASTILLO, and RAY HIDALGO, by being leader of the gang
giving the okay to commit the offense, by planning the offense, by ordering
gang members to commit the offense, by calling Creeper to bring the weapons,
by selecting certain gang members to participate in the offense, by gathering
the gang members at Juanon's house, by planning to approach the victims'
location from the empty field North of the victims' location, by explaining the
victims' location to the group, by calling Bones to participate, by calling Ram
to participate, by calling Rick to participate, by calling Kito to participate, by
calling Perro to participate, by calling Little Sal to participate, by calling
Marcial to participate, by arranging transportation to and from the victims'
location, by driving participants to the victims' location, or by driving
participants from the victims' location . . .


 In contrast, the "conspiracy" portion required the jury to find that the co-defendants
"entered into a conspiracy to rob" the victims "and that pursuant thereto did carry out, or
attempt to carry out, such conspiracy to rob" the victims "in that . . . in the course of
committing theft of personal property" from the victims "to-wit, money, jewelry, drugs, a cell
phone, or personal papers, and with intent to obtain or maintain control of said property" the
co-defendants "intentionally caused bodily injury" to the victims "to-wit, death, by shooting"
the victims "with a firearm or firearms, intending thereby to kill" the victims. (38) It authorized
the jurors to convict appellant as a conspirator if they found that. . . the Defendant, HUMBERTO GARZA, pursuant to said conspiracy, if any,
with the intent to promote and assist [CO-DEFENDANTS] in the commission
of said robbery, if any, was acting with and aiding one or more of the said CO-DEFENDANTS in the execution or attempted executions of said robbery of
the said JIMMY ALMENDARIZ, JUAN DELGADO, III, JERRY EUGENE
HIDALGO, JUAN DELGADO, JR., RUBEN CASTILLO, and RAY
HIDALGO, if any, and that the shooting of the said JIMMY ALMENDARIZ,
JUAN DELGADO, III, JERRY EUGENE HIDALGO, JUAN DELGADO,
JR., RUBEN CASTILLO, and RAY HIDALGO followed in the execution of
the conspiracy, if any, of HUMBERTO GARZA and one or more of the said
CO-DEFENDANTS to rob the said JIMMY ALMENDARIZ, JUAN
DELGADO, III, JERRY EUGENE HIDALGO, JUAN DELGADO, JR.,
RUBEN CASTILLO, and RAY HIDALGO of his property, and that the
shooting of the said JIMMY ALMENDARIZ, JUAN DELGADO, III, JERRY
EUGENE HIDALGO, JUAN DELGADO, JR., RUBEN CASTILLO, and
RAY HIDALGO by one or more of the said CO-DEFENDANTS, if there was
such, was done in furtherance of the conspiracy to rob the said JIMMY
ALMENDARIZ, JUAN DELGADO, III, JERRY EUGENE HIDALGO,
JUAN DELGADO, JR., RUBEN CASTILLO, and RAY HIDALGO, if any,
and was an offense that should have been anticipated as a result of the carrying
out of the conspiracy . . . 


The general verdict form did not require the jury to specify which theory of party liability it
relied upon. (39)

 Appellant asserts that "the trial court submitted [the] conspiracy theory to the jury in
such a way that he could be convicted of capital-murder under circumstances not giving rise
to the anticipation that human life would be taken." He claims that "the jurors likely thought
this application paragraph was satisfied if the offense that was or should have been
anticipated was the shooting of the six named persons, not necessarily the killing of them." 
When we review a charge for alleged error, we must examine the charge as a whole instead
of a series of isolated and unrelated statements. (40) The charge stated that the co-defendants'
"shooting" of the victims was done in furtherance of the conspiracy to rob and was an
offense that should have been anticipated as a result of carrying out the conspiracy. We do
not view this statement in isolation. The charge also stated that the co-defendants
"intentionally caused bodily injury" to the victims, "to-wit, death, by shooting" them "with
a firearm or firearms, intending thereby to kill" them. Thus, the "shooting" offense that
appellant should have anticipated as a result of carrying out the conspiracy was the co-defendants' shooting the victims to death with the intent to kill them. There is no reasonable
likelihood that the jury applied the challenged instruction in an erroneous way. (41) Appellant also contends that the trial court commented on the weight of the evidence
by "stating as established fact matters that were elements for the State to prove." He argues
that the long list of specific acts in the "party" portion of the charge was unnecessary and
called undue attention to the State's theory of the case. He complains about the inconsistent
use of the phrase "if any," arguing that its omission in certain places suggested "established
facts." He further asserts that the inclusion of the co-defendants' "alias nicknames" was
"suggestive of prior criminal activity and predisposition." In sum, he argues: "[B]y telling
the jury that [appellant] was the leader of a group of criminals that had done a series of acts
resulting in the deaths of six named persons, the court sent the message that the prosecution
had proved their case and that the inevitable verdict was 'guilty.'" We disagree.

 The language in the capital-murder application paragraph tracked the statutory
language contained in Sections 7.02(a) and 7.02(b). Appellant's gang membership was
raised by the evidence. The gang names and activities detailed in the charge reflected the
State's theory; however, the inclusion of these details did not endorse that theory, nor were
they presented as "established facts." The jurors were clearly instructed to find appellant
guilty of capital-murder only if they found the stated elements "from the evidence beyond
a reasonable doubt." The wording of the charge was not an improper comment on the weight
of the evidence. Point of error seven is overruled.

 In point of error eight, appellant argues that Apprendi and Ring (42) mandate that future-dangerousness "must be proven beyond a reasonable doubt, rather than by the current
statutory requirement of a 'probability' of future-dangerousness beyond a reasonable doubt,
which is a much lower standard." In points of error nine and ten, he argues that Article
37.071 violates due process and amounts to cruel and unusual punishment. He asserts that
the misleading use of the undefined term "probability" permits the jury to find future-dangerousness based on a standard less than "beyond a reasonable doubt."

 We have previously upheld the constitutionality of Article 37.071 when faced with
these arguments. (43) Apprendi and Ring have no applicability to Article 37.071 in its current
form. (44) The inclusion of the term "probability" does not render the future-dangerousness
special issue unconstitutional. (45) The State must prove beyond a reasonable doubt that there
is a probability that the defendant will be a continuing threat to society. (46) This is
constitutionally sufficient. (47) Points of error eight, nine, and ten are overruled.

 In points of error eleven and twelve, appellant contends that Article 37.071 violates
the Eighth and Fourteenth Amendments to the United States Constitution "by instructing
jurors to decide the likelihood of [appellant's] future-dangerousness through a vague
definition of 'continuing threat to society.'" We have held that the reference to the statutory
term "society" is not unconstitutionally vague and that the jury is presumed to understand it
without an instruction. (48) Appellant has not persuaded us to overrule our precedent. Points
of error eleven and twelve are overruled.

 In points of error thirteen, fourteen, and fifteen, appellant challenges the version of
Article 37.071 under which he was sentenced because it failed to provide the jury with the
option to sentence him to life without parole. He asserts that the statute amounts to cruel and
unusual punishment in violation of the Eighth Amendment and offends his rights to due
process and equal protection under the Fourteenth Amendment. We have previously denied
such claims, (49) and appellant fails to persuade us that our prior holding is incorrect. Points
of error thirteen, fourteen, and fifteen are overruled.

 In points of error sixteen and seventeen, appellant argues that the evidence is legally
and factually insufficient to support the jury's affirmative finding on the future-dangerousness special issue. In points of error eighteen and nineteen, appellant contends that
the trial court violated the Eighth and Fourteenth Amendments by sentencing him to death
without legally or factually sufficient evidence of future-dangerousness. 

 We do not conduct factual sufficiency reviews of the future-dangerousness special
issue. (50) In evaluating legal sufficiency, we view the evidence in the light most favorable to
the jury's finding and determine whether any rational trier of fact could have found beyond
a reasonable doubt that there is a probability that appellant would commit criminal acts of
violence that would constitute a continuing threat to society. (51) 

 The State presented evidence at the guilt phase that appellant, although not a
"triggerman," was a gang leader who planned and orchestrated the brutal killings of six rival
gang members. (52) At punishment, the State also presented evidence of appellant's prior
criminal history. Appellant committed the offense of unauthorized use of a motor vehicle
at age fifteen and was placed on probation. He was later committed to TYC after violating
the conditions of his probation. He was released on parole shortly thereafter. In July 1991,
just a few days before his seventeenth birthday, he committed the offense of attempted
murder when he stabbed a man during an altercation. On September 10, 1991, he was
certified to be tried as an adult for that offense. On September 25, 1991, he committed
burglary of a habitation. He pleaded guilty to both offenses in 1992 and was sentenced to
eighteen years in the Texas Department of Criminal Justice (TDCJ). He committed several
disciplinary offenses while incarcerated in TDCJ, including getting into a fist fight with one
inmate and stabbing another inmate with a homemade weapon. He was released on parole
in April 2002 and committed the instant offense in January 2003. This evidence, viewed in
the light most favorable to the jury's finding, was sufficient to support the jury's affirmative
answer to the future-dangerousness special issue. Points of error sixteen, seventeen,
eighteen, and nineteen are overruled.

 In point of error twenty, appellant claims that Article 37.071 violates the Fourteenth
Amendment by implicitly placing the burden on the defendant to prove mitigation, rather
than requiring the jury to make a finding against the defendant on that issue beyond a
reasonable doubt. He also asserts that the aggravating factor of future-dangerousness must
be alleged in the indictment before the State can seek the death penalty. In support of these
claims, he cites Apprendi, Ring, and Blakely v. Washington. (53) We have previously rejected
these claims, (54) and appellant does not persuade us that our prior cases were wrongly decided. 
Point of error twenty is overruled.

 In points of error twenty-one through twenty-six, appellant argues that Article 37.071
violates the Eighth and Fourteenth Amendments to the United States Constitution. He claims
that the mitigation special issue "forces jurors to weigh the aggravating circumstances against
mitigating circumstances," and, as a result, it "does not provide a means for jurors to give
effect to the mitigating circumstances warranting a life sentence," it "shifts the burden of
proof to the defendant to prove that sufficient mitigating circumstances exist to warrant a life
sentence," and it "does not require jurors to consider mitigating circumstances alone in
determining whether a life sentence is warranted."

 The jury's consideration of aggravating circumstances in deliberating on the
mitigation issue is permitted, but not required. (55) Article 37.071 does not shift the burden of
proof to the accused to prove a mitigating circumstance. (56) We have consistently declined to
hold Article 37.071 unconstitutional for failing to assign a burden of proof on the mitigation
special issue. (57) Points of error twenty-one through twenty-six are overruled.

 In points of error twenty-seven through twenty-nine, appellant argues that Article
37.071 violates the Eighth and Fourteenth Amendments "by failing to provide for any
meaningful appellate review of the mitigation special issue in the punishment phase of the
trial." We have previously rejected this claim. (58) Points of error twenty-seven through
twenty-nine are overruled.

 In points of error thirty through thirty-three, appellant raises several challenges to the
"10-12 rule." Art. 37.071, § 2(d) and § 2(f). He argues that the trial court should have
instructed the jury that a single holdout juror on any special issue would result in an
automatic life sentence. He asserts that the trial court's failure to do so amounted to cruel
and unusual punishment under the Eighth Amendment, denied him due process under the
Fourteenth Amendment, and denied him a fair and impartial jury and effective assistance of
counsel under the Sixth Amendment.

 We have consistently upheld the "10-12 rule" as constitutional. (59) The instructions on
answering the special issues do not mislead the jury into thinking that an affirmative answer
should be given unless ten or more jurors agree to give a negative one. (60) Any juror who
wishes to vote for life contrary to the votes of the majority is given an avenue to
accommodate the complained-of potential disagreements, "for every juror knows that capital
punishment cannot be imposed without the unanimous agreement of the jury on all three
special issues." (61) The "10-12 rule" ensures the proper level of juror deliberation. (62) It serves
this value by not informing the jury of the consequences of a non-verdict, while at the same
time ensuring that the death penalty will not be imposed without the unanimous consent of
the jury. (63) Points of error thirty through thirty-three are overruled. 

 We affirm the trial court's judgment and sentence of death in Count Two.


Delivered: April 30, 2008


Do Not Publish 
















 
1. Appellant was also indicted under Cause Number CR-0947-03-G for murdering more
than one person during the same criminal transaction. Tex. Penal Code § 19.03(a)(7). On
October 19, 2004, the trial court ordered that cause to be "merged into CR-3175-04-G."
2. Tex. Penal Code §§ 19.03(a)(2) and 19.03(a)(7).
3. Tex. Penal Code § 19.02(b). 
4. Tex. Penal Code § 19.03(a)(2).
5. Tex. Code Crim. Proc. art. 37.071, § 2(g).
6. Id., art. 37.071, § 2(h).
7. The "west-side house" had a kitchen, living room, two bedrooms, and a utility room. 
There was a storage shed behind it. An outhouse was located behind the "east-side house."
8. U. S. Const. amend. V; Tex. Const. art. I, § 14. Appellant also claims that
"[c]ollateral estoppel bars the conviction and sentence in the second prosecution styled 'Count
Two.'" This claim is multifarious. Tex. R. App. P. 38.1(h). It is also without merit. As
discussed herein, appellant was convicted and sentenced on both counts in a single proceeding. 
There was no "second prosecution." 
9. Gonzalez v. State, 8 S.W.3d 640, 642-643 (Tex. Crim. App. 2000). 
10. Tex. Penal Code § 7.02(a). 
11. Tex. Penal Code §§ 7.02(a) and 7.02(b).
12. This quoted instruction is worded exactly as it appears in the Count One charge. There
are a few minor grammatical variations in the Count Two charge.
13. Villanueva v. State, 227 S.W.3d 744, 747 (Tex. Crim. App. 2007) (citing Ex parte
Kopecky, 821 S.W.2d 957, 958 (Tex. Crim. App. 1992)). 
14. Id.
15. See id.
16. We recently addressed a "multiple punishments" double-jeopardy claim for one of
appellant's co-defendants. Ramirez v. State, No. AP-75,167 (Tex. Crim. App. Dec. 12, 2007)
(not designated for publication). Ramirez was convicted of capital murder and sentenced to
death in two separate counts. In Ramirez, as in the present case, one count alleged murder in the
course of robbery under Section 19.03(a)(2) and one count alleged the murders of more than one
person during the same criminal transaction under Section 19.03(a)(7). Id., slip. op. at 11. In
Ramirez and in this case, both counts arose from the same conduct on the same date involving
the same victims. Id. We held in Ramirez that the same evidence that formed the basis for "the
same criminal transaction" element in one count also formed the basis for the robbery element in
the other count and that there was only one "allowable unit of prosecution" under the statute in
that circumstance. Id., slip. op. at 11-12. We held that Ramirez had been subjected to multiple
punishments for the same offense in violation of double-jeopardy, and we reversed his conviction
and vacated his death sentence on one of the counts. Id., slip. op. at 12. 
17. Langs v. State, 183 S.W.3d 680, 685 (Tex. Crim. App. 2006).
18. Johnson v. State, 208 S.W.3d 478, 510 (Tex. App.-Austin 2006, pet. ref'd); Honeycutt
v. State, 82 S.W.3d 545, 547 (Tex. App.-San Antonio 2002, pet. ref'd). 
19. Ex parte Cavazos, 203 S.W.3d 333, 337 (Tex. Crim. App. 2006). 
20. Id. at 338. 
21. Appellant's appeal from his murder conviction and life sentence in Count One, Garza
v. State, No. 13-05-00397-CR, is currently pending in the Thirteenth Court of Appeals. Because
appellant's capital murder conviction and death sentence in Count Two is retained as "the most
serious offense," the Thirteenth Court of Appeals may consider reversing appellant's murder
conviction on double-jeopardy grounds. 
22. Cavazos, 203 S.W.3d at 337
.
23. Bigon v. State, ___ S.W.3d ___, ___, Nos. PD-1769-06 & PD-1770-06, 2008 Crim.
App. LEXIS 1, at *30-31 (Tex. Crim. App. Jan. 16, 2008). 
24. See Tex. R. App. P. 38.1.
25. Strickland v. Washington, 466 U.S. 668, 687 (1984).
26. Id. at 689. 
27. Id. at 688.
28. Id. at 694.
29. Goodspeed v. State, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005).
30. Id.
31. Id.
32. Id.
33. Id.
34. See Goodspeed, 187 S.W.3d at 392-94 (holding that counsel's failure to ask any
questions during voir dire could not be treated as ineffective assistance without inquiry into
reasons for the conduct).
35. We understand appellant to be raising this issue solely in terms of trial-court bias, not
as a claim of ineffective assistance of counsel. To the extent that he is attempting to raise a
Strickland argument, his claim is multifarious and inadequately briefed. Tex. R. App. P. 38.1 
36. Brumit v. State, 206 S.W.3d 639, 645 (Tex. Crim. App. 2006). 
37. Tex. Penal Code § 19.03(a)(2). 
38. The conspiracy portion adds another co-defendant: Jeffrey Juarez a/k/a "Dragon."
39. The verdict form stated: "We, the Jury, find the Defendant, HUMBERTO GARZA,
GUILTY of the offense of Capital-murder as charged in the indictment." 
40. Dinkins v. State, 894 S.W.2d 330, 339 (Tex. Crim. App. 1995). 
41. Boyde v. California, 494 U.S. 370, 380 (1990).
42. Apprendi v. New Jersey, 530 U.S. 466 (2000); Ring v. Arizona, 536 U.S. 584 (2002). 
43. Rayford v. State, 125 S.W.3d 521, 534 (Tex. Crim. App. 2003). 
44. Id.
45. Id.
46. Id.
47. Id.
48. Murphy v. State, 112 S.W.3d 592, 606 (Tex. Crim. App. 2003). 
49. Arnold v. State, 873 S.W.2d 27, 39-40 (Tex. Crim. App. 1993). 
50. McGinn v. State, 961 S.W.2d 161, 169 (Tex. Crim. App. 1998).
51. Jackson v. Virginia, 443 U.S. 307 (1979). 
52. In its determination of the future-dangerousness special issue, the jury is entitled to
consider all of the evidence presented at both the guilt and punishment stages of trial. Druery v.
State, 225 S.W.3d 491, 507 (Tex. Crim. App.), cert. denied, 128 S. Ct. 627 (2007). 
53. 542 U.S. 296 (2004).
54. Roberts v. State, 220 S.W.3d 521, 535 (Tex. Crim. App.), cert. denied, 128 S. Ct. 282
(2007); Renteria v. State, 206 S.W.3d 689, 709 (Tex. Crim. App. 2006); Jones v. State, 119
S.W.3d 766, 791 (Tex. Crim. App. 2003).
55. Hankins v. State, 132 S.W.3d 380, 385 (Tex. Crim. App. 2004); Mosley v. State, 983
S.W.2d 249, 263 n.18 (Tex. Crim. App. 1998). 
56. Threadgill v. State, 146 S.W.3d 654, 672 (Tex. Crim. App. 2004).
57. Russeau v. State, 171 S.W.3d 871, 886 (Tex. Crim. App. 2005), cert. denied, 126 S. Ct.
2982 (2006); Resendiz v. State, 112 S.W.3d 541, 549-50 (Tex. Crim. App. 2003). 
58. Renteria, 206 S.W.3d at 707; Russeau, 171 S.W.3d at 886.
59. Prystash v. State, 3 S.W.3d 522, 536 (Tex. Crim. App. 1999); McFarland v. State, 928
S.W.2d 482, 519 (Tex. Crim. App. 1996); Lawton v. State, 913 S.W.2d 542, 558-59 (Tex. Crim.
App. 1995). 
60. Prystash, 3 S.W.3d at 536. 
61. Id. (quoting Lawton v. State, 913 S.W.2d 542, 559 (Tex. Crim. App. 1995)).
62. Id. at 537.
63. Id.