

# NUMBER 13-10-00510-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

---

**JUAN MANUEL HINOJOSA,**          **Appellant,**

**v.**

**THE STATE OF TEXAS,**          **Appellee.**

---

### On appeal from the 103rd District Court
### of Cameron County, Texas.

---

## MEMORANDUM OPINION

### Before Justices Rodriguez, Vela, and Perkes
### Memorandum Opinion by Justice Perkes

Appellant, Juan Manuel Hinojosa, appeals his conviction for aggravated assault, a second-degree felony enhanced to a habitual-felony offense by two prior felony convictions. *See* TEX. PENAL CODE ANN. §§ 12.42(b), (c)(1), 22.02(a)(2) (West Supp. 2010). Following a jury trial, appellant was found guilty, sentenced to a term of forty years of confinement in the Texas Department of Criminal Justice, Institutional Division, and fined $10,000. By three issues, appellant argues: (1) the evidence was insufficient to show he intentionally,

knowingly, or recklessly used or exhibited a deadly weapon to stab the complainant; (2) the trial court erred by allowing the State to amend the indictment on the first day of trial to allege the habitual-felony-offender enhancement; and (3) the trial court abused its discretion by denying appellant's oral motion for a ten-day continuance to address the habitual-felony offender enhancement. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. The Offense

During the guilt-innocence phase of trial, the State called nine witnesses. Appellant did not call any witnesses or submit any evidence. David Galvan testified that he lived with his grandmother and that he was stabbed in his grandmother's front yard. Earlier that evening, he went to a friend's house to play video games. He left his friend's house at approximately 9:30 or 9:45 p.m. and walked home. When he arrived home, he entered through the front door and turned on the television set. After hearing some loud voices calling his name, he went outside and saw appellant and Rodolfo Orozco Duran standing outside the front gate of the home. Galvan recognized them as they lived a block away. Galvan testified that both appellant and Duran appeared nervous and "jittery." They did not appear to be sober, and he believed they were high on cocaine.

Appellant and Duran asked Galvan for water, and he went inside and brought them water. They then asked him for more water, and he went inside and brought them more water. When Galvan handed them the second cup of water, one or both of the men asked Galvan if he knew where to obtain cocaine, and Galvan stated that he did not. Suddenly, Duran struck Galvan with his fist. Appellant and Duran then rushed in through the gate and attacked Galvan, punching and kicking him several times. One or both of the assailants

2

grabbed Galvan's shirt and pulled it over his head so that he could not see.   Nonetheless, Galvan attempted to defend himself by punching back.   They fought for "quite a while" until Galvan was down on one knee.   At that point, Galvan's grandmother, who was inside the house, said that she was going to call the police.   Appellant and Duran fled.

After the attack, Galvan went inside the house.   He felt warm liquid dripping down his spine.   He removed his shirt and discovered he was "all bloody."   He had been stabbed by a sharp object in both the neck and back.

On direct examination, Galvan testified that because everything happened so quickly and because his shirt was pulled over his head during the struggle, he was not completely certain as to what type of weapon was used or who stabbed him.   However, on redirect examination, Galvan was shown a copy of his statement to the police, taken shortly after the incident, wherein he indicated to officers that Duran stabbed him with a knife.   Galvan then testified that his statement to police as to who stabbed him was correct.[1]   However, he was still uncertain as to what type of weapon was used.   He could only say that it was a sharp object.   Galvan did not know why he was attacked.

Galvan's grandmother, Flor Estela Torres, testified that she witnessed the incident. Torres was at the front door when appellant and Duran approached her home and she saw Galvan take appellant and Duran water.   Once Galvan provided the second cup of water, appellant and Duran attacked him, forcing him back towards the front door where Torres was standing.   She saw the men pull Galvan's shirt up.   "This guy started sticking him with something."   As to who did the stabbing, Torres testified that she believed it was appellant,

---

[1]   Galvan testified that he was afraid to testify for fear of retaliation.   It was Galvan's understanding that both appellant and Duran were gang members.

but that she was not certain. After the assailants ran off, Galvan entered the house, bleeding profusely. Torres called the police.

Harlingen police officer Dionicio De Leon testified that he was dispatched to Galvan's home on the night of the stabbing. He was the first officer on the scene. When Officer De Leon arrived, he found Galvan hunched over a chain-link fence, bleeding profusely. Galvan appeared to have approximately four recently-inflicted lacerations caused by a sharp object. Galvan told him that two males had attacked him and that he was stabbed with a knife. Galvan identified "Rudy" (Duran) as one of the attackers. Officer De Leon testified he saw blood "all over;" there was blood on the sidewalk, front porch, and near the fence. He also observed some broken clay pottery in front of the residence, but he did not find a knife in the vicinity. Galvan was transported to the hospital by ambulance.

Sergeant Jamie Palafox of the Harlingen Police Department's gang unit testified that he was on patrol when the stabbing call came in and that he went to the crime scene. When he arrived, Sergeant Palafox observed Galvan standing in his yard, "bleeding profusely from his back." Sergeant Palafox took statements from Galvan and his grandmother and photographed the crime scene. Several hours after the stabbing, Sergeant Palafox returned to the neighborhood where the crime occurred and a male informant flagged down Sergeant Palafox down. The informant advised him that one of the people involved with the stabbing was known as "Borrado." Sergeant Palafox recognized this name as appellant's nickname. He had made contact with appellant several times in the past.

Investigator Joe Michael Salinas of the Harlingen Police Department testified that he also responded to the scene of the aggravated assault. He observed Galvan's wounds

4

and, based upon his training and experience, was of the opinion that Galvan had sustained stab wounds from a sharp object. Investigator Salinas generated two photo lineups, one featuring Duran and the other featuring appellant. Galvan identified both of the men.

A few hours after the stabbing, Investigator Salinas went on patrol and came across a disturbance at a residence about a half block away from where the stabbing occurred. He observed appellant and a woman arguing in the front yard of a residence. Appellant, who was intoxicated, was detained for public intoxication and as a suspect in the stabbing. With the consent of the owner of the residence, Investigator Salinas and other officers entered the residence and found Duran in a back bedroom. He was arrested for outstanding municipal court warrants. Appellant and Duran were transported to the city jail.

At the time the suspects were booked, Investigator Michael Fechner observed blood splatter on both Duran and appellant's shirts. A woman who lived near Galvan's house testified that she observed Duran and appellant immediately after the stabbing and that she saw blood on Duran's hands.

The emergency-room physician who treated Galvan's injuries testified that Galvan had sustained a stab wound to the posterior neck, three stab wounds to the mid-right back, a laceration on the back of the head and a bruise on the forehead. Swelling around the stab wounds on Galvan's back indicated force. The stab wounds were linear, and made by a sharp object which the physician referred to as a knife. The CT scan administered to Galvan did not show any fragments within the wounds which would suggest the wounds were caused by, for example, broken glass or porcelain. The treating physician testified that the wounds did not look like they were caused by falling on "glass." Galvan's medical records indicated that he reported to medical providers that he was punched, kicked, and

5

then stabbed with a knife.   The stab wounds were "deep" and at least one was near the midline in the center of the back where the vertebrae are located.   The physician testified that a stab wound to the midline could cause paralysis and a wound that penetrated the rib cage could cause death.   However, none of Galvan's stab wounds penetrated the rib cage or chest wall.   Galvan was treated and released.

**B.   The Indictment and the State's Notice of Intent to Enhance Punishment**

The State indicted appellant for aggravated assault.   In its indictment, the State included an enhancement count that alleged appellant had a prior felony conviction for burglary of a habitation.   In its enhancement count, the State listed a cause number and court for the prior offense, but the cause number listed apparently corresponded to a prior offense Duran committed, not appellant.

The record reflects that on the morning of trial, and prior to jury selection, the State abandoned the enhancement count in the indictment.   Rather, the State filed a new pleading on the morning of the trial, but before jury selection, titled "State's Notice of Intent to Seek an Enhanced Range of Punishment."   In that pleading, the State gave notice that it intended to enhance appellant's punishment to that of a habitual-felony offender by proving two prior felony convictions, in addition to the present offense.

In response, appellant's counsel asked the trial court for ten days to prepare for trial based on an amendment to the indictment and "short notice" of the enhancement.   The trial court responded that the amendment did not change the offense charged and said "all it does is dismiss an enhancement count."   The trial court denied appellant's request.   Jury selection started later the same morning.

The record shows appellant was aware of the habitual-felony offender enhancement

6

prior to jury selection because he rejected a plea offer in which the enhancement was discussed. After defense counsel informed the trial court that appellant was rejecting the State's plea offer, the trial court discussed the plea offer with appellant on the record. The trial court explained to appellant that he was charged with aggravated assault with a deadly weapon and that the punishment range for that offense was normally two to twenty years. The trial court explained further that the State had given appellant's attorney notice of intent to seek an enhanced punishment range, and, that based on appellant's two prior convictions, the State sought to have him punished as a habitual-felony offender. The trial court explained that the punishment range for a habitual-felony offender is twenty-five to ninety-nine years or life in prison, and that if he were convicted by the jury, he faced a minimum sentence of twenty-five years. Appellant said he understood and told the trial court that he was rejecting the State's plea recommendation of a fifteen-year sentence without an enhancement.

## II.  ISSUES PRESENTED

Appellant presents the following issues for review:[2]

(1) Is the evidence sufficient to show appellant intentionally, knowingly, or recklessly used a deadly weapon to stab Galvan?

(2) Did the trial court err by allowing the State to amend the indictment on the first day of trial to allege the habitual-felony offender enhancement and thereby deprive appellant of adequate notice of the enhancement allegations?

(3) Did the trial court abuse its discretion by denying defense counsel's oral motion for a ten-day continuance to address the habitual-felony offender enhancement?

---

[2] In the interest of judicial economy, we paraphrase appellant's issues as we deem necessary. *See* TEX. R. APP. P. 47.1.

# III. ANALYSIS

## A. Sufficiency of the Evidence

By his second issue, appellant argues that the evidence is insufficient to support the jury's finding that he intentionally, knowingly, or recklessly assaulted Galvan with a deadly weapon. Appellant stresses that Galvan and his grandmother both admitted they were uncertain regarding the object which was used to cut Galvan and that Galvan's injuries were consistent with cuts received from falling and landing on broken pieces of pottery.

Evidence is insufficient if, when viewed in a light most favorable to the verdict, a rational jury could not have found each element of the offense beyond a reasonable doubt. *Wesbrook v. State,* 29 S.W.3d 103, 111 (Tex. Crim. App. 2000) (citing *Jackson v. Virginia,* 443 U.S. 307 (1979)). In evaluating a legal-sufficiency challenge, we consider all of the evidence and view it in the light most favorable to the verdict. *Jackson*, 443 U.S. at 319. The issue on appeal is not whether we, as a court, believe the State's evidence or believe that appellant's evidence outweighs the State's evidence. *Wicker v. State*, 667 S.W.2d 137, 143 (Tex. Crim. App. 1984). The verdict may not be overturned unless it is irrational or unsupported by proof beyond a reasonable doubt. *Matson v. State*, 819 S.W.2d 839, 846 (Tex. Crim. App. 1991). The trier of fact is the sole judge of the credibility of the witnesses and of the strength of the evidence. *Fuentes v. State,* 991 S.W.2d 267, 271 (Tex. Crim. App. 1999). The trier of fact may choose to believe or disbelieve any portion of the witnesses' testimony. *Sharp v. State,* 707 S.W.2d 611, 614 (Tex. Crim. App. 1986). When faced with conflicting evidence, we presume the trier of fact resolved conflicts in favor of the prevailing party. *Turro v. State*, 867 S.W.2d 43, 47 (Tex. Crim. App. 1993). Therefore, if any rational trier of fact could have found the essential elements of the crime beyond a

8

reasonable doubt, we must affirm. *McDuff v. State,* 939 S.W.2d 607, 614 (Tex. Crim. App. 1997) (citing *Jackson*, 443 U.S. at 319).

We measure the sufficiency of the evidence by the elements of the offense as defined by a hypothetically correct jury charge. *Villarreal v. State,* 286 S.W.3d 321, 327 (Tex. Crim. App. 2009) (citing *Malik v. State,* 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which defendant was tried. *Id.*

A person commits an assault if he intentionally, knowingly, or recklessly causes bodily injury to another. TEX. PENAL CODE ANN. §22.01(a)(1) (West 2011). The offense is aggravated assault if the person uses or exhibits a deadly weapon during the commission of the assault. *Id.* § 22.02(a)(2). A deadly weapon is "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." *Id.* § 1.07(17)(B). In this case, the State alleged in the indictment that appellant committed aggravated assault by stabbing and or cutting Galvan with a "deadly weapon, to-wit: [a] knife or weapon unknown to the grand jury."

A knife is not a deadly weapon per se. *See Thomas v. State,* 821 S.W.2d 616, 619–20 (Tex. Crim. App. 1991). A knife becomes a deadly weapon if its use or intended use renders it capable of causing death or serious bodily injury. *See* TEX. PENAL CODE ANN. § 1.07(a)(17)(B); *McCain v. State,* 22 S.W.3d 497, 503 (Tex. Crim. App. 2000). We consider whether there is sufficient evidence to show the actor used the knife or intended to use the knife in such a way that it was "capable of causing death or serious bodily injury."

9

*Alvarez v. State,* 566 S.W.2d 612, 614 (Tex. Crim. App. 1978). Whether a knife is a deadly weapon by design, a deadly weapon by usage, or not a deadly weapon, depends on the evidence of each individual case. *Thomas,* 821 S.W.2d at 620. Factors considered in determining whether a knife is a deadly weapon in its use or intended use include the: (1) dimensions of the knife, (2) manner of its use or intended use, (3) nature or existence of inflicted wounds, and (4) testimony of the knife's life-threatening capabilities, if used. *Id.* at 619.

After reviewing the evidence, we conclude a rational jury could have found beyond a reasonable doubt that appellant committed aggravated assault with a knife or other deadly weapon. *See Jackson*, 443 U.S. at 326. As summarized above, substantial evidence, including Galvan's statements on the day of the incident (that he was stabbed with a knife), Investigator Salinas's testimony, and expert medical testimony, all support the conclusion that appellant used a knife or other sharp object to stab Galvan multiple times, thereby causing serious bodily injury. The knife or other weapon was of sufficient size to make deep wounds that could have caused death or paralysis had the wounds penetrated the rib cage or midline, respectively. Based on the evidence of the severity of the Galvan's injuries and how appellant used the knife or other weapon, there is no doubt the knife or other weapon in this case was a deadly weapon. *See McCain*, 22 S.W.3d at 497 (finding evidence sufficient to support the conclusion that a butcher knife was a deadly weapon). Appellant's second issue is overruled.

## B. The Indictment and the Sufficiency of the Enhancement Notice

By his first issue, appellant argues that the trial court effectively allowed the State to amend the indictment on the day of trial by letting the State abandon the enhancement

paragraph and provide a new separate notice of habitual-felony offender enhancement. Appellant argues that he had insufficient notice of the enhancement allegation to allow him to prepare a defense.[3]   We disagree.

The record shows that shortly before jury selection began, the State abandoned the enhancement allegation included in the indictment.   However, the record further shows that the State did not "amend" the indictment.   "An indictment . . . may not be amended over the defendant's objection as to form or substance if the amended indictment . . . charges the defendant with an additional or different offense or if the substantial rights of the defendant are prejudiced."  TEX. CODE CRIM. PROC. ANN. art. 28.10(c) (West 2011); *see also id.* art. 28.10(b).   A "different offense" means a different statutory offense.  *Stautzenberger v. State*, 232 S.W.3d 323, 327–28 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (citing *Flowers v. State,* 815 S.W.2d 724, 728 (Tex. Crim. App. 1991)).   Thus, an amendment to an indictment is a change that affects the substance of the indictment.   *Id.*   An enhancement paragraph is not part of the State's case-in-chief and is not part of the "substance" of an indictment.   *Id.*   In fact, enhancement allegations are mere surplusage, and need not be pled on the face of the charging instrument.   *Id.* (citing *Johnson v. State,* 214 S.W.3d 157, 158 (Tex. App.—Amarillo 2007, no pet.)).   The abandonment of surplusage does not invoke the requirements of article 28.10(c) of the Texas Code of Criminal Procedure.   *Id.* (citing *Chavis v. State,* 177 S.W.3d 308, 311 (Tex. App.—Houston

---

[3]   Although appellant frames his argument in terms of both the United States and Texas Constitutions, he does not separately brief his state and federal constitutional claims.   An appellant claiming relief under both the federal and state constitutions must "analyze, argue or provide authority to establish that his protection under the Texas Constitution exceeds or differs from that provided to him by the Federal Constitution."  *Arnold v. State,* 873 S.W.2d 27, 33 (Tex. Crim. App. 1993). Therefore, we assume appellant claims no greater protection under the state constitution than that provided by the federal constitution.  *See Muniz v. State,* 851 S.W.2d 238, 251–52 (Tex. Crim. App. 1993).

[1st Dist.] 2005, pet. ref'd)). Thus, the State may, with the permission of the trial court, abandon an enhancement paragraph, as it did in this case. *See id.* (citing *Hall v. State,* 862 S.W.2d 710, 714 (Tex. App.—Beaumont 1993, no pet.)).

The State is not required to give pretrial notice that trial on the substantive offense will be followed by a habitual-criminal proceeding. *See Pelache v. State*, 324 S.W.3d 568, 577 (Tex. Crim. App. 2010). There is no requirement that the State give ten days' notice that it will seek to enhance punishment. *See Villescas v. State*, 189 S.W.3d 290, 292–94 (Tex. Crim. App. 2006) (holding that "when a defendant has no defense to the enhancement allegation and has not suggested the need for a continuance in order to prepare one, notice given at the beginning of the punishment phase satisfies the federal constitution"). In determining whether appellant received sufficient notice of the State's intent to enhance punishment, we look to the record to identify whether appellant's defense was impaired by the timing of the State's notice. *Pelache*, 324 S.W.3d at 577.

Here, the record contains no evidence that appellant's defense was impaired by the timing of the State's notice. Appellant had notice of the enhancements at the time of plea bargaining. *See id.* at 578 (considering whether defendant had notice of enhancement at the time of plea bargaining). And while appellant pleaded "not true" to the State's enhancements and objected that the State should not be allowed to give notice of enhancement on the day the guilt-innocence phase of trial started, appellant thereafter stipulated at the punishment phase to the convictions that formed the basis of the State's habitual-felony offender enhancement. *See Villescas*, 189 S.W.3d at 295. Appellant did not demonstrate during a hearing on a motion for new trial or otherwise, that with earlier notice of the enhancements, he would have been better able to defend against the

12

enhancements at the punishment phase of trial. *See id.*; *Pelache*, 324 S.W.3d at 577. We overrule appellant's first issue on appeal.

## C. Appellant's Motion for Continuance

By his third issue, appellant argues that the trial court erred by denying his request for a continuance that he made before the trial started, after the State gave its enhancement notice. Appellant characterizes his request as an oral motion for a ten-day continuance.

An unsworn oral motion for continuance, like the one in this case, preserves nothing for appellate review in the event the trial court denies the motion. *See Anderson v. State*, 301 S.W.3d 276, 279 (Tex. Crim. App. 2010) (citing TEX. CODE CRIM. PROC. arts. 29.03, 29.08 and finding oral, unsworn motion for continuance made just before jury selection preserved nothing for appellate review). Accordingly, we overrule appellant's third issue.

## IV. CONCLUSION

We affirm the trial court's judgment.

_____
Gregory T. Perkes
Justice

Do not publish. TEX. R. APP. P. 47.2(b).
Delivered and filed the
19th day of July, 2012.

13